# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

LINCOLN MEMORIAL UNIVERSITY,
a not-for-profit corporation,

      Plaintiff,

v.

AMERICAN VETERINARY MEDICAL
ASSOCIATION,

      Defendant.

Case No. 3:25-cv-0282

**JURY TRIAL DEMANDED**

## COMPLAINT

Timothy B. McConnell (TN 019136)
MAYNARD NEXSEN PC
4800 Old Kingston Pike, Suite 120
Knoxville, TN 37919
T: (865) 686-5624
tmcconnell@maynardnexsen.com

Thomas W. Thagard III (TN 041673)
James C. Lester (*pro hac vice* forthcoming)
S. Reeves Jordan (*pro hac vice* forthcoming)
William B. Grimes (*pro hac vice* forthcoming)
MAYNARD NEXSEN PC
1901 Sixth Avenue North, Suite 1700
Birmingham, AL 35203
T: (205) 254-1000
tthagard@maynardnexsen.com
jlester@maynardnexsen.com
rejordan@maynardnexsen.com
bgrimes@maynardnexsen.com

*Counsel for Plaintiff Lincoln Memorial University*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

PARTIES ...............................................................................................................................10

JURISDICTION AND VENUE ...........................................................................................11

FACTUAL ALLEGATIONS .................................................................................................12

I.      The AVMA and the AVMA COE's Inherent Conflicts of Interest ....................................12

II.     The Relevant Markets .................................................................................................18

       A.      The Veterinary Education Market ........................................................................18

       B.      The Veterinary Services Market ...........................................................................20

       C.      The Veterinary Accreditation Market ...................................................................21

III.    The Existing Market Shortages and the AVMA's Response.............................................22

       A.      Increases in Consumer Demand, Market Shortages, and the Cost of Veterinary Services.............................................................................................22

       B.      The AVMA's Protectionist Response to These Market Dynamics .....................26

IV.    The AVMA Targets New and Potential Competitors—Such as LMU—in the Veterinary Education Market ..........................................................................................29

       A.      LMU's Success Story as a College of Veterinary Medicine ................................30

       B.      The "Distributive" Model of Veterinary Clinical Education ................................31

       C.      The AVMA's Accreditation Standards and Process.............................................36

V.     The Effects of the AVMA's Anticompetitive Scheme on LMU-TN ...............................40

VI.    The Effects of the AVMA's Anticompetitive Scheme on LMU-OP................................49

CAUSES OF ACTION ........................................................................................................53

RELIEF SOUGHT.................................................................................................................64

# INTRODUCTION

1.     "Federal antitrust law is a central safeguard for the Nation's free market structures. In this regard it is as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *N.C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 502 (2015) (citation omitted).

2.     This is a case about competitors conspiring to restrain trade, eliminate competition, reduce output, and raise prices in two inextricably intertwined markets; thereby, inflicting injury to consumers of both markets: (a) the U.S. domestic market for veterinary education; and (b) the U.S. domestic market for providing professional veterinary care and services. To carry out their illegal scheme, the conspirators have acted in concert in seeking to exclude Plaintiff Lincoln Memorial University ("LMU")—the largest provider of veterinary education in the country—from the veterinary education market, in violation of the U.S. antitrust laws.

3.     The U.S. veterinary education market includes the teaching facilities and services used to train veterinarians in conferring the Doctor of Veterinary Medicine ("DVM") degree, comprising 34 existing veterinary institutions. These 34 veterinary schools are vitally necessary to the U.S. professional veterinary services market: the schools are the services market's virtual sole source of veterinarians.

4.     The conspirators are members and officers of the American Veterinary Medical Association ("AVMA"), a trade association representing over 100,000 veterinarians. Through its internal arm the Council on Education ("AVMA COE"), the AVMA controls the accreditation of veterinary schools throughout the United States. The AVMA's members have engaged in a conspiracy to control, manipulate, and reduce new competition in the face of an existing market shortage of veterinarians, resulting in (a) reduced competition for students among the 34 existing

1

veterinary schools, and (b) reduced output of new veterinarians into the veterinary services market, therefore increasing prices above normal competitive levels.

5.     Specifically, the AVMA is using the AVMA COE to restrict the accreditation of new and existing veterinary schools by demanding that they meet arbitrary, unreasonable, and impossible-to-meet requirements entirely unrelated to the minimum quality of education necessary to graduate day-one-ready veterinarians with entry-level competency. The AVMA has recently begun for the first time requiring veterinary schools (including new private non-profit, or in some cases, public, schools) seeking AVMA COE accreditation to offer students access to an unstated and unknowable number and amount of research faculty, research curricula, research facilities, extramural grants, and exposure to graduate students involved in research.

6.     These research offerings are almost solely the purview of existing traditional land grant, Ivy League, and/or state-funded universities, all of which are overwhelmingly driven and funded by (a) federal grants, such as grants obtained through the National Institutes of Health ("NIH") and the U.S. Food and Drug Administration ("FDA"), (b) state funding, and (c) large endowments.

7.     The AVMA is fully cognizant of the fact that its research requirements simply cannot be met by new private schools funded at the outset almost entirely by tuition alone. Moreover, the virtual impossibility of meeting these requirements is exacerbated in this day and age of substantially restricted NIH and FDA funding, lack of access to grants for research, and scarce research faculty.

8.     With respect to LMU, the AVMA has deployed these requirements as a basis for placing LMU's existing College of Veterinary Medicine ("CVM") in Harrogate, Tennessee on probationary accreditation as of October 2024. This is a dramatic change in course when compared

to the AVMA COE's prior years-long findings that LMU was in full compliance with the AVMA COE's accreditation standards. This probationary status is a necessary intermediate step and precursor to the termination of accreditation for LMU's Harrogate campus altogether.

9. Evidencing the anticompetitive conspiracy that the AVMA is carrying out, two years before the AVMA COE decided to place LMU's existing CVM program on probation, the AVMA COE approved a request by LMU to add an additional 100 students per year with *no mention* of any concerns whatsoever about LMU's research programs. It was only later, in 2024, *at the same time* that the AVMA began making public comments about the threat to the veterinary services market presented by the anticipated increase in the number of veterinary schools, that the AVMA COE decided to suddenly take issue with the research programs that LMU had been successfully operating for years without issue.

10. In addition, the AVMA has utilized its research requirements as a basis for alleging major deficiencies regarding LMU's planned introduction of a second CVM campus in Orange Park, Florida.

11. As another alleged deficiency with LMU's planned Orange Park campus, the AVMA has begun insisting that veterinary schools seeking AVMA COE accreditation offer students substantial direct experiences with veterinary interns and residents—which are categories of students that, for the most part, simply do not exist at new private schools without graduate programs. Veterinary interns and residents are largely the domain of the existing traditional land grant, Ivy League, and/or state-funded research institutions.

12. These "deficiency findings" are a precursor to the impending denial of LMU's application for the accreditation of its planned Orange Park campus. The outcome, if this course

of action is not halted, will be the complete exclusion of both of LMU's CVM campuses from the veterinary education market.

13.     The AVMA's decision to target LMU is no surprise, as LMU is the largest provider of veterinary education in the United States when measured by the size of the student body, with entering class sizes of approximately 225 students per class year. LMU's student body currently represents approximately 4% of the students enrolled in all domestic DVM programs. Furthermore, LMU's proposed addition of a second campus in Orange Park would, if allowed to proceed, have a planned initial class size of 150 students per year. It makes complete sense, then, that in executing on its conspiracy to reduce the total number of graduates, the AVMA's first line of attack would be directed at LMU.

14.     The AVMA's public attacks on LMU also make clear to other similarly situated impending market entrants (*i.e.*, new veterinary schools with similarly limited financial resources) that they are also unwelcome in the market and will not be approved by the AVMA COE. Thus, considered in full, the impact of the AVMA's anticompetitive actions is already extraordinarily material with the potential for greater effects in the future should their conspiracy to suppress competition continue unabated.

15.     Incredibly, the AVMA has openly acknowledged its desire to restrict output in both the veterinary education and services markets in order to ensure the artificial stabilization of prices that can be charged to consumers of veterinary services.

16.     For example, in January 2025, the President of the AVMA published this statement:

> The data suggest that the growing number of veterinarians in the
> United States may eventually outpace future demand for veterinary
> services. . . . Steady growth is projected over the next several years
> for three indicators or influencers of demand for veterinary services:
> consumer expenditures on veterinary services, personal disposable
> income, and the number of pet-owning households. . . . ***However,***

4

*the growth rate for the supply of veterinarians, based on the current number of veterinary colleges and estimated class sizes, is expected to outpace the projected growth in demand for veterinary services. What's more, <u>this situation is expected to intensify</u> if 13 proposed new veterinary colleges begin graduating students.*[1]

17.     Similarly, in an October 2024 blog post, the AVMA wrote about the "economic health of the veterinary profession" in the context of supply and demand, a clear indication that they considered the risk that additional supply would place on prices:

> However, the same cannot be said for the supply of veterinarians. That growth rate, based on the current number of veterinary colleges and estimated class sizes, is expected to diverge from the projected growth in demand for veterinary services.
>
> What's more, **<u>this situation is expected to worsen</u> if 13 proposed new veterinary colleges start graduating students** . . . . Beyond 2035, the forecast suggests a looming challenge for the veterinary profession: The expected increase in the number of veterinarians may outpace demand for veterinary services driven by pet ownership, available disposable income, and consumer spending on veterinary services. **It might require a substantial increase in utilization of veterinary services to comfortably absorb the additional veterinarians—and without that, the economic health of the veterinary profession could be at risk.**[2]

18.     Another AVMA-published article, quoting a study commissioned by the AVMA, was released in November 2024 and argued that no veterinarian shortage exists while highlighting the economic risks of adding new schools and graduating new veterinarians. The AVMA makes clear that the threat facing the profession is due to additional supply from new schools and the "economic pressure" it would create, *i.e.*, that it would lower prices:

> *If 13 new schools come onstream in the near future as proposed, it will require a significant increase in demand for veterinary*

---

[1] Sandra Faeh, DVM, *So, There's a Shortage of Veterinarians? Not So Fast.*, J. AM. VETERINARY MED. ASS'N, Vol. 263, Issue 1, p. 13 (Jan. 2025), https://avmajournals.avma.org/view/journals/javma/263/1/javma.263.1.13.xml?tab_body=pdf (emphasis added).

[2] *Chart of the Month: No Dire Shortage of Veterinarians Ahead*, AVMA (Oct. 17, 2024), https://www.avma.org/blog/chart-month-no-dire-shortage-veterinarians-ahead (emphasis added).

*services above current trends to absorb the additional supply without downward economic pressure.*[3]

19. These statements lay bare the conspiracy at the heart of the AVMA COE's restrictive and unreasonable application of its accreditation standards. It is not the purview of the AVMA COE to manage "downward economic pressure" in the form of lower prices from additional veterinarians in the veterinary services market, but it is trying to accomplish just that.

20. In so acting, the AVMA COE is behaving contrary to its stated mission, which is to serve as the "accrediting body responsible for setting veterinary education standards and assessing veterinary colleges to meet the minimum requirements for graduating day-one-ready veterinarians."[4] In other words, "[a]ccreditation [by the AVMA COE] assures students the accredited institution offers an educational program *that will allow them to develop entry-level competency.*"[5]

21. In fulfilling this mission, the AVMA COE cannot legally cap or limit the total number of veterinary schools it accredits (or the number of students that graduate from those institutions), as long as those institutions provide a minimum quality veterinary education that will

---

[3] *Existing Veterinary Colleges Adequate to Meet US Companion Animal Veterinary Demand Until At Least 2035, Major New Study Published in JAVMA Finds*, AVMA (Nov. 25, 2024), https://www.avma.org/news/press-releases/existing-veterinary-colleges-adequate-meet-us-companion-animal-veterinary (emphasis added).

[4] *Update on Changes to the AVMA COE Accreditation Standards*, AVMA (May 1, 2025), https://www.avma.org/blog/update-changes-avma-coe-accreditation-standards.

[5] Accreditation Policies and Procedures of the AVMA Council on Education ("AVMA COE Policies") § 1.1, https://www.avma.org/sites/default/files/2025-05/coe-pp-Jan-2025_revised-Mar-2025.pdf (emphasis added).

allow students to develop entry-level competency to practice veterinary medicine. By the AVMA COE's own admission, "[s]uch activity would be viewed as anti-competitive."[6]

22.     Yet, despite its clear mission, the AVMA, effectuating a conspiracy between its members and officers, has improperly utilized the AVMA COE's power to illegally restrict the number of accredited schools of veterinary medicine, the output of veterinary students and ultimately, the number of veterinarians in the United States—all for the anticompetitive and expressly stated purpose of preventing "downward economic pressure." *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988) ("There is no doubt that the members of such associations often have economic incentives to restrain competition and that the product standards set by such associations have a serious potential for anticompetitive harm.").

23.     Furthermore, not only is the AVMA carrying out an unlawful *conspiracy* to restrain competition, it is also unlawfully utilizing its *monopoly* power in the U.S. market for the accreditation of veterinary schools to restrict output in the veterinary education and services markets.

24.     The AVMA's arbitrary and unreasonable implementation of its accreditation standards has also resulted in a denial of due process to LMU, which is entitled under federal common law to a fair review by an impartial and unbiased accreditor.

25.     As a result of the AVMA's anticompetitive acts, harm to competition in the veterinary education and services markets is already occurring, while greater harm is threatened in the future. The AVMA COE's decision to place LMU's CVM program in Harrogate, Tennessee on probationary accreditation in October 2024 has eliminated any ability for LMU to expand the

---

[6] *FAQs About the AVMA Council on Education (COE)*, AVMA, https://www.avma.org/education/center-for-veterinary-accreditation/coe-faqs.

class sizes for that program in the short term beyond the current class size of 225. Moreover, the act of placing LMU on probation was a shot heard around the veterinary education world—this information is published and is not kept secret—and makes clear to other prospective CVM programs with limited financial resources that accreditation will not be forthcoming.

26.     The harm to competition from the AVMA COE's restrictions in the output of veterinary schools and veterinarians is evident in the fact that veterinary care costs have risen more than 60% since 2014, nearly twice the general rate of inflation.[7] In fact, a 2025 Gallup assessment revealed that more than one-third of pet owners decided to forgo needed veterinary services in the past year, or have previously declined care that was recommended by a veterinarian, for financial reasons.[8] These are not the signs of a properly functioning marketplace.

27.     The threatened harm to competition from the AVMA COE's conspiracy to restrict output is greater still, as the ultimate effect, absent this Court's intervention, will be LMU's exclusion altogether from the veterinary education market at both its currently operating campus in Tennessee (again, with current class sizes of 225 per year) and its proposed campus in Florida (with planned class sizes of 150 per year). By restricting the number of veterinary schools (as well as the number of seats at each of those schools), the AVMA is able to restrict the output of veterinary practitioners in the services market in a very material way.[9] In fact, the elimination of

---

[7] *State of Pet Care Study | Pet Parents' Assessment of American Veterinary Care*, GALLUP/PETSMART CHARITIES, p. 15 (Apr. 2025), available at https://www.gallup.com/analytics/659123/gallup-petsmart-charities.aspx.

[8] *State of Pet Care Study | Pet Parents' Assessment of American Veterinary Care*, GALLUP/PETSMART CHARITIES, p. 3 (Apr. 2025), available at https://www.gallup.com/analytics/659123/gallup-petsmart-charities.aspx.

[9] The AVMA COE controls both accreditation and increases in class sizes of more than 10%. AVMA COE Policies § 3.4.1.

LMU from the veterinary education market would reduce the total percentage of future veterinary students by approximately 8%.

28.     These restrictions will only exacerbate the existing shortages of veterinary schools and veterinary practitioners, predictably resulting in less competition among the veterinary schools and increased costs to consumers forced to pay artificially high veterinarian prices going forward.

29.     LMU itself has been and will continue to be injured as a result of the AVMA's anticompetitive behavior. LMU's current probationary status for its existing CVM program in Tennessee places a cloud over LMU that affects employers, faculty, staff, and students. LMU's ongoing and threatened injuries include, among other things, negative reputational effects, lost revenues, diminished ability to recruit faculty, and ultimately the exclusion of LMU from the veterinary education market altogether.

30.     LMU brings this suit to prevent its exclusion from the market for veterinary education by the illegal concerted action of the AVMA's members through the AVMA and its accrediting arm, the AVMA COE. LMU and other potential new veterinary schools are now confronted with arbitrary, insurmountable barriers to entry created by the AVMA. These barriers render it all but impossible to open a new veterinary school, notwithstanding obvious, unfulfilled demand for both more veterinary schools and more practicing veterinarians.

31.     LMU seeks an injunction to stop the AVMA from continuing to implement its accreditation standards in an anticompetitive fashion divorced from its stated mission of ensuring the entry-level competency of graduates of veterinary schools. In addition, LMU requests that this Court implement what is perhaps the only viable long-term solution to the problem created by the AVMA's economic incentives and resulting anticompetitive behavior: the complete and total separation of the veterinary accrediting body (the AVMA COE) from the trade association (the

AVMA) in which it operates. These remedies are necessary to restore free and unrestricted competition in the markets affected by the AVMA's unlawful scheme.

## PARTIES

32.     Plaintiff Lincoln Memorial University is a private Tennessee not-for-profit corporation. LMU's principal place of business and headquarters is 6965 Cumberland Gap Parkway, Harrogate, Tennessee 37752.

33.     Defendant American Veterinary Medical Association is an Illinois not-for-profit corporation operating as a national trade association whose membership is open to all veterinarians in the United States, including private practitioners and educators. The AVMA's principal place of business and headquarters is 1931 North Meacham Road, Suite 100, Schaumburg, Illinois 60173.

34.     Various other persons not made defendants to this action have participated as conspirators in the combination, conspiracy, and anticompetitive acts alleged in this Complaint, including the members and officers of the AVMA.

35.     Through its internal arm the AVMA COE, the AVMA establishes standards for the accreditation of veterinary schools. The AVMA COE is recognized by the U.S. Secretary of Education as an agency responsible for the accreditation of CVMs, which confer DVM degrees. The Secretary of Education sets general standards to be followed by recognized accrediting agencies, but does not approve the AVMA's specific accreditation procedures or the application of those procedures.

36.     The AVMA admits that the AVMA COE is not a separate legal entity, but rather operates as an "internal branch" of the AVMA. *See Gunawardana v. Am. Veterinary Med. Ass'n*,

No. 21-1330, 2021 WL 4951697, at *1 (7th Cir. Oct. 25, 2021); *see also id.* No. 21-1330, ECF No. 21, p. 1.

37.    Members of the AVMA COE are expected to "[u]phold the fiduciary responsibility of a member of the COE," which includes both a "duty of loyalty" and a "duty of obedience" to the AVMA COE and ultimately to the AVMA itself.[10]

38.    The AVMA's membership is composed of practicing veterinarians who compete against each other in the market for veterinary care and academicians of veterinary medicine who compete against each other for places at various institutions and for grant money. Actions taken on behalf of the AVMA and the AVMA COE therefore, by definition, constitute the agreement of market competitors. "The actions of a group of competitors taken in one name present the same potential evils as do the actions of a group of competitors who have not created a formal organization within which to operate." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1007 (3d Cir. 1994).

## JURISDICTION AND VENUE

39.    This civil action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and the federal common law.

40.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1337(a); Section 16 of the Clayton Act, 15 U.S.C. § 26; and the Higher Education Act, 20 U.S.C. § 1099b(f).

41.    Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d), because, at all relevant times, the AVMA resided,

---

[10] AVMA COE Policies § 1.3.3.

transacted business, or was found in this District, and because a substantial part of the events, acts, or omissions giving rise to this action occurred in this District.

42.     This Court has personal jurisdiction over the AVMA pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, because the AVMA is a corporation subject to service of process within the United States. This Court also has personal jurisdiction over the AVMA pursuant to Tennessee's long-arm statute and principles of due process because the AVMA engaged in anticompetitive and unlawful acts directed toward and that had a direct, foreseeable, and intended effect of causing injury within this District.

43.     The AVMA COE's accrediting activities and operations—which are the means by which the AVMA is carrying out its anticompetitive and unlawful designs—involve and affect the flow of, and have a substantial effect on, interstate commerce. The AVMA's anticompetitive accrediting activities have, and will continue to have, a deleterious impact on LMU's ability to recruit and enroll out-of-state students, receive tuition revenues from out-of-state sources, and attract out-of-state faculty and staff members. AVMA members and employees travel throughout the country—and have traveled to LMU's Tennessee campus and planned Florida campus—to perform site visits, which are an important feature of the AVMA's accrediting activities.

## FACTUAL ALLEGATIONS

## I.     The AVMA and the AVMA COE's Inherent Conflicts of Interest

44.     The AVMA is a trade association representing over 100,000 veterinarians. On the homepage of the "Advocacy" section of its website, the AVMA describes itself as the "nation's leading representative of the veterinary profession."[11]

---

[11] *AVMA Advocacy*, AVMA, https://www.avma.org/advocacy.

45.     Through the AVMA COE, the AVMA maintains exclusive control over the accreditation of veterinary schools in the United States. The AVMA COE is currently the only accrediting authority for DVM programs in the United States.[12]

46.     The AVMA COE received this authority from the Department of Education pursuant to 20 U.S.C. § 1099b.

47.     Presently, there are only 34 accredited or provisionally accredited DVM programs in the United States.[13] By way of comparison, there are approximately 200 accredited professional schools in the United States that offer medical degrees—Doctor of Medicine ("MD") or Doctor of Osteopathic Medicine ("DO").[14]

48.     Florida, for example, has just one accredited veterinary school offering a DVM degree, and this school produces only approximately 125-150 DVM graduates a year even though Florida is a rapidly growing state with nearly 25 million residents.

49.     As recognized by the U.S. Department of Education and the AVMA COE itself, the "purpose of accreditation" is to ensure that the "accredited institution offers an education program that will allow [students] to develop entry-level competency."[15]

---

[12] AVMA COE Policies § 1.2.2.

[13] *Accredited Veterinary Colleges*, AVMA, https://www.avma.org/education/center-for-veterinary-accreditation/accredited-veterinary-colleges.

[14] *Accredited MD Programs in the United States*, LIAISON COMM. ON MED. EDUC., https://lcme.org/directory/accredited-u-s-programs/; *Osteopathic Medical Schools*, AM. OSTEOPATHIC ASS'N, https://osteopathic.org/about/affiliated-organizations/osteopathic-medical-schools/.

[15] AVMA COE Policies § 1.1; *Overview of Accreditation in the United States*, U.S. DEP'T OF EDUC., https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/college-accreditation/overview-of-accreditation-united-states#Overview ("The goal of accreditation is to ensure that institutions of higher education meet acceptable levels of quality.").

50.     Critically, the delegated accreditation authority from the Department of Education **does not** empower the AVMA COE to control or restrain *the overall number* of accredited institutions or *the overall number* of students who graduate from those accredited institutions for the purpose of limiting "economic pressure" or any other reason beyond the competency of student preparation and training. Neither does the AVMA COE's own mission statement suggest such authority or responsibility.

51.     To the contrary, the Sherman Act demands that such restraints must be imposed only by external market forces, such as the demand for veterinary services by consumers.

52.     Indeed, the National Advisory Committee on Institutional Quality and Integrity, a panel within the U.S. Department of Education overseeing accreditation, has commented that it is not the AVMA COE's role to consider market demands or to act as a workforce gatekeeper.[16]

53.     Instead, the AVMA COE's sole authority and responsibility is to ensure that veterinary schools offer a minimum standard quality education that sufficiently prepares graduates for the North American Veterinary Licensing Examination ("NAVLE") and the day-one demands of real-world veterinary medical practice. However, its conduct has flatly contradicted its own mission statement: "Accrediting agencies are not allowed to use accreditation to manipulate the workforce; the mandate of accreditation is limited to the quality of education. Therefore, no accrediting agency can make accreditation decisions designed to limit the number of schools or

---

[16] Malinda Larkin, *'Philosophical Differences of Opinion': Plenty of Issues Brought Up at USDE Meeting; Few Answers*, AVMA (Jan. 30, 2013), https://www.avma.org/javma-news/2013-02-15/philosophical-differences-opinion.

graduates, as long as the quality of education is maintained. Such activity would be viewed as anti-competitive."[17]

54.    All 50 states require a DVM to have graduated from an accredited school as a prerequisite to practicing veterinary medicine.[18]

55.    If a school lacks AVMA COE accreditation, its students cannot obtain federal funding for student loans to defray the cost of attendance.[19]

56.    Even if an unaccredited CVM program were feasible (which it is not), a school that operates an unaccredited CVM program loses its eligibility for AVMA COE accreditation in the future.[20]

57.    As the sole arbiter of accreditation determinations, the AVMA, through the AVMA COE, controls the flow of new CVM programs into the veterinary education market. *See Pro. Massage Training Ctr., Inc. v. Accreditation All. of Career Sch. & Colls.*, 781 F.3d 161, 170 (4th Cir. 2015) ("[A]ccreditors wield enormous power over institutions—life and death power, some might say.").

58.    There is no legal distinction between the AVMA and the AVMA COE, which is merely an internal branch of the AVMA. As a result, the AVMA COE's members' "fiduciary"

---

[17] *FAQs About the AVMA Council on Education (COE)*, AVMA, https://www.avma.org/education/center-for-veterinary-accreditation/coe-faqs.

[18] There are two exceptions: most states allow graduates of certain foreign veterinary schools to become licensed if they receive a certificate of eligibility from the Educational Commission for Foreign Veterinary Graduates or the Program for the Assessment of Veterinary Education Equivalence.

[19] AVMA COE Policies § 1.1.

[20] Robert J. Gitter, Ph.D., Bill LaFayette, Ph.D., *Demand for and Supply of Veterinarians in the U.S. to 2032*, AM. ASS'N OF VETERINARY MED. COLLS., p. 6 (June 2024), https://www.aavmc.org/wp-content/uploads/2024/06/Demand-for-and-Supply-of-Veterinarians-in-the-U.S.-to-2032-New.pdf.

obligations and their duties of loyalty and obedience necessarily run through the COE to the AVMA itself. In addition:

    a.   A large percentage of the AVMA COE's funding flows directly from the AVMA's coffers, and that funding requires the approval of the AVMA Board of Directors;

    b.   The AVMA COE relies heavily on the AVMA for staffing, and the AVMA COE's staff are actually AVMA employees, reporting directly to AVMA officials;

    c.   The AVMA COE and AVMA are located in the same building, and the AVMA COE staff members even have AVMA email addresses;

    d.   Together, the AVMA and the AVMA COE select a majority of the 20-member AVMA COE Board;[21]

    e.   The AVMA COE has no permanent governing official; and

    f.   Perhaps most egregious, appeals from adverse AVMA COE accreditation decisions are heard by an ad hoc seven-member panel that is handpicked by the AVMA Board of Directors.[22]

59.    The concerns surrounding the AVMA COE's structural conflicts of interest are further exacerbated by its "closed-door" deliberations, which cloak the AVMA COE's accreditation decisions in a veil of secrecy to everyone except AVMA staff. This closed-door

---

[21] AVMA COE Policies § 1.3.1 (eight selected by the AVMA COE Selection Committee and three selected by the AVMA COE). The AVMA COE Selection Committee is appointed by the AVMA Board of Directors. *Council on Education Selection Committee*, AVMA, https://www.avma.org/about/councils-committees-task-forces-and-trusts/council-education-selection-committee.

[22] AVMA COE Policies § 2.5.4.

policy prevents the public from assessing the complete extent of the AVMA's dominant influence over the AVMA COE's decision-making.

60.     Meanwhile, entirely *inconsistent* with the AVMA COE's accreditation mission, the AVMA admittedly exists to serve the interests, economic and otherwise, of its members, who are existing veterinary practitioners and academics.

61.     For instance, one self-described purpose of the AVMA is to ask "how can we make veterinary medicine a more profitable endeavor."[23]

62.     Further, the AVMA describes its mission as identifying, promoting, and implementing "programs and services that protect and enhance the economic well-being of its members."[24]

63.     Critically, in executing this purpose and mission, the AVMA does *not* represent either prospective consumers of veterinary education or consumers of veterinary services.

64.     Thus, the AVMA's members have economic incentives to limit the number of veterinary schools and candidates for veterinary practice. By so doing, the AVMA's members are able to keep new competitors out of their markets; reduce competition for grants, faculty positions, and funding; and reduce the number of competing veterinarians in the services market, thereby maintaining higher, less competitive fees for veterinary services.

---

[23] Malinda Larkin, *Antitrust Caution Clashes with Workforce Concerns: FTC Say It's Watching Associations' Activities*, AVMA (July 1, 2014), https://www.avma.org/javma-news/2014-07-15/antitrust-caution-clashes-workforce-concerns (AVMA's general counsel: "Associations, unfortunately, are inherently suspect because they're groups of competitors coming together to better their businesses. **For the AVMA, part of what we do is to ask, 'How can we make veterinary medicine a more profitable endeavor?'** When that is part of the goal, antitrust regulators will watch to see how groups are going to do that without violating the law." (emphasis added)).

[24] *FAQs About the AVMA Council on Education (COE)*, AVMA, https://www.avma.org/education/center-for-veterinary-accreditation/coe-faqs.

65. Because of the risks to the marketplace, the Department of Education, Federal Trade Commission, and other regulators have warned trade associations—including the AVMA—not to influence the decisions of accreditation bodies operating inside their organizations (like the AVMA COE).[25] But that admonition has been to no avail here.

66. The AVMA cannot, on the one hand, discharge its duties as an objective accreditation body while also serving the economic interests of the AVMA and its members, who stand to benefit—in the form of artificially high rates they can charge consumers—by artificially limiting the sources of new veterinarians.

## II. The Relevant Markets

67. There are two relevant product markets in this case that are harmed by the AVMA's conduct: (a) the U.S. domestic market for veterinary education, which includes the services and facilities used to educate veterinary students (*i.e.*, candidates for DVM degrees); and (b) the U.S. domestic market for veterinary services.

68. In addition, as relates to the AVMA's unlawful use of monopoly power, a third relevant market exists: the U.S. domestic market for the accreditation of veterinary schools.

### A. The Veterinary Education Market

69. The U.S. veterinary education market includes the teaching facilities and services used to train veterinarians in conferring DVM degrees, comprising 34 existing accredited and provisionally accredited veterinary institutions.[26] The consumers in this market are students seeking DVM degrees.

---

[25] Malinda Larkin, *Antitrust Caution Clashes with Workforce Concerns: FTC Say It's Watching Associations' Activities*, AVMA (July 1, 2014), https://www.avma.org/javma-news/2014-07-15/antitrust-caution-clashes-workforce-concerns.

[26] *Accredited Veterinary Colleges*, AVMA, https://www.avma.org/education/center-for-veterinary-accreditation/accredited-veterinary-colleges.

70. The U.S. veterinary education market does *not* include the market for certificates of eligibility offered through the AVMA-controlled Educational Commission for Foreign Veterinary Graduates ("ECFVG") or through the Program for the Assessment of Veterinary Education Equivalence ("PAVE"). A certificate of eligibility obtained through one of these programs—which is necessary in order to allow a candidate who does not possess a DVM degree from a domestic veterinary school to sit for the NAVLE test that all candidates must pass in order to become licensed veterinarians in the United States—is not a comparable substitute for a DVM degree obtained from one of the 34 existing U.S. veterinary institutions. *See Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 933 (6th Cir. 2005) (in defining a product or service market, courts consider whether products or services are "reasonabl[y] interchangeabl[e]"). To obtain a certificate of eligibility through either the ECFVG program or the PAVE program, a candidate must possess a degree from one of several *foreign* veterinary schools, none of which operate within the United States. In addition, candidates who seek certificates of eligibility through the ECFVG or PAVE programs must pay significant fees and have a longer path to employment compared to graduates of domestic veterinary schools.

71. The relevant geographic market for the veterinary education market is the United States. Students travel from all over the country to attend the 34 existing domestic veterinary schools, according to data compiled by the American Association of Veterinary Medical Colleges.

72. The AVMA, through its accrediting arm the AVMA COE, possesses market power in the veterinary education market as a result of its ability to restrict the number of domestic veterinary schools (and to restrict the number of seats at each of those schools). *See Ohio v. Am. Express Co.*, 585 U.S. 529, 549 (2018) ("Market power is the ability to raise prices profitably *by restricting output*." (emphasis in original and citation omitted)).

73.     Barriers to entry into the veterinary education market are extremely high due to the cost, time consumption, and risk built into the accreditation process, the initial cost of capital necessary to qualify for accreditation under the standards set by the AVMA COE, the high cost of land, facilities, and faculty, the entrenchment of the 34 existing veterinary schools, and the behavior of the AVMA as herein alleged.

74.     LMU currently competes in the veterinary education market through its existing CVM program in Harrogate, Tennessee and intends to compete in this market at its planned second CVM campus in Orange Park, Florida.

**B.     The Veterinary Services Market**

75.     The U.S. veterinary services market is the market for the provision of professional veterinary care and services. The consumers in this market are owners of animals.

76.     In the alternative, the U.S. veterinary services market can be divided into product submarkets, including the market for the provision of companion animal services (*i.e.*, veterinary care and services for household pets); the market for the provision of food animal services (*i.e.*, veterinary care and services for animals raised as food sources); and the market for equine services. Graduates of LMU's CVM program receive education and training in companion animal, food animal, and equine practices, and LMU's graduates are represented throughout each of these product submarkets.

77.     The relevant geographic market for the veterinary services market is the United States. LMU places its graduates in veterinary service positions throughout the country and currently enrolls approximately 4% of the students in the entire U.S. veterinary education market, with a greater going-forward market share of approximately 8% anticipated if LMU's planned second campus in Orange Park is allowed to proceed.

78.     In the alternative, the veterinary services market can be divided into regional submarkets based on consumer willingness and ability to travel for veterinary services. *See Spirit Airlines*, 431 F.3d at 932 ("A geographic market is defined as an area of effective competition or the locale in which consumers of a product or service can turn for alternative sources of supply." (citation omitted)). For purposes of this suit, the relevant geographic submarkets include, at a minimum, the regional submarkets for veterinary services in: (a) the Appalachian region stretching across portions of Kentucky, Tennessee, Georgia, and Ohio; (b) Florida; and (c) Texas. LMU has traditionally placed a substantial portion of its graduates into veterinary service positions in each of these regional submarkets.

79.     The AVMA, through its accrediting arm the AVMA COE, possesses market power in the veterinary services market as a result of its ability to restrict the number of domestic veterinary schools (and to restrict the number of seats at each of those schools), which allows the AVMA to thereby restrict the output of candidates for practitioner positions in the veterinary services market.

80.     LMU does not compete in the veterinary services market. However, LMU's injuries in the veterinary education market in which it does compete are inextricably intertwined with the veterinary services market because LMU graduates candidates for veterinary practice who feed into—and increase the supply of—the veterinary services market. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 483–84 (1982) (plaintiff was proper party to assert antitrust claims where, although she "was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict").

### C.     The Veterinary Accreditation Market

81.     The U.S. veterinary accreditation market is the market for the provision of accrediting services for domestic veterinary schools.

82.     As the sole accreditor of domestic veterinary schools, the AVMA, through the AVMA COE, possesses monopoly power in the veterinary accreditation market. The AVMA COE has the unilateral ability to restrict the number of domestic veterinary schools (and to restrict the number of seats at each of those schools). *See Spirit Airlines*, 431 F.3d at 935 (monopoly power is the "power to raise prices or to exclude competition when it is desired to do so" (citation omitted)).

83.     The AVMA, through the AVMA COE, is unlawfully using its monopoly power in the veterinary accreditation market to restrict the output of both domestic veterinary schools (in the veterinary education market) and domestic practitioners (in the veterinary services market) for the benefit of its existing members. The AVMA maintains exclusive control over how many CVMs are able to obtain and retain accreditation, and by this control is able to, and has, limited the number of competitors in the veterinary education market and the number of students graduating to become veterinarians in the United States.

## III.    The Existing Market Shortages and the AVMA's Response

84.     The AVMA has sought, and continues to seek, to maintain an imbalance in the market for veterinary services to ensure an insufficient supply of practitioners to meet increasing demand.

85.     The AVMA's economic protectionist intent has manifested itself no more clearly than in the present debate over shortages in the veterinary services market.

### A.    Increases in Consumer Demand, Market Shortages, and the Cost of Veterinary Services

86.     The total number of veterinary medical schools has remained relatively constant over the past 45 years, despite increases in consumer demand and professional service shortages that have developed in the veterinary industry.

87.     The increase in consumer demand for veterinary services is stark and undeniable. As of this year, approximately 67% of U.S. households own pets, and the number of pet-owning households is increasing 1.5% annually.[27]

88.     In recent decades, accounting for the growth in the number of households who purchase veterinary services, overall demand for veterinary services has increased approximately 6.1% per year.[28]

89.     A 2019 study used then-current data to estimate that there will be a 33% increase in spending on pet healthcare services by 2030.[29]

90.     The shortage of professional veterinary services is similarly remarkable. A recent analysis indicated that the number of open positions for veterinary specialists exceeded the number of available candidates by as much as four times.[30]

91.     Another study showed that a full 10% of veterinary school faculty positions remain unfilled.[31]

---

[27] James W. Lloyd, DVM, Ph.D., *Pet Healthcare in the U.S.: Another Look at the Veterinarian Workforce*, MARS VETERINARY HEALTH, p. 4 (Aug. 1, 2023), https://www.marsveterinary.com/media/uploads/2023/08/Characterizing-the-Need.pdf.

[28] James W. Lloyd, DVM, Ph.D., *Pet Healthcare in the U.S.: Another Look at the Veterinarian Workforce*, MARS VETERINARY HEALTH, p. 4 (Aug. 1, 2023), https://www.marsveterinary.com/media/uploads/2023/08/Characterizing-the-Need.pdf.

[29] James W. Lloyd, DVM, Ph.D., *Pet Healthcare in the US: Are There Enough Veterinarians?*, MARS VETERINARY HEALTH, p. 1 (Apr. 14, 2021), https://www.marsveterinary.com/media/uploads/2022/03/Characterizing%20the%20Need%20-%20DVM%20-%20FINAL_2.24.pdf.

[30] *AAVMC Statement on U.S. Veterinary Workforce*, AM. ASS'N OF VETERINARY MED. COLLS., pp. 1–2 (July 2022), https://www.aavmc.org/wp-content/uploads/2022/07/AAVMC-Statement-on-Workforce-July-2022.pdf.

[31] James W. Lloyd, DVM, Ph.D., Lisa M. Greenhill, *The Veterinary Specialist Faculty Shortage: It Is Not All About the Numbers*, VETERINARY OPHTHALMOLOGY, p. 1 (June 2025), https://onlinelibrary.wiley.com/doi/epdf/10.1111/vop.70034.

92.     Another economic study concluded that there will be a shortage of 14,000 to 24,000 pet healthcare veterinarians by 2030, which represents an overall shortfall of approximately 11-18%.[32]

93.     Similarly, a July 2024 study found that, by 2032, there will be a 24% shortfall in the number of veterinarians needed to meet demand.[33]

94.     This year, the U.S. Department of Agriculture announced that the number of rural "veterinary shortage areas" reached the highest number ever.

95.     Because 60-70% of veterinarians provide healthcare for pets, shortages in the companion animal sector are the most visible. However, shortages in other practice areas are also concerning.

96.     Specifically, there is a significant shortage in the number of veterinarians who provide equine care.[34]

97.     There is also a severe shortage in the number of food animal veterinarians who care for livestock and other animals raised for consumption.[35]

---

[32] James W. Lloyd, DVM, Ph.D., *Pet Healthcare in the U.S.: Another Look at the Veterinarian Workforce*, MARS VETERINARY HEALTH, p. 6 (Aug. 1, 2023), https://www.marsveterinary.com/media/uploads/2023/08/Characterizing-the-Need.pdf.

[33] Robert J. Gitter, Ph.D., Bill LaFayette, Ph.D., *Demand for and Supply of Veterinarians in the U.S. to 2032*, AM. ASS'N OF VETERINARY MED. COLLS., p. 2 (June 2024), https://www.aavmc.org/wp-content/uploads/2024/06/Demand-for-and-Supply-of-Veterinarians-in-the-U.S.-to-2032-New.pdf.

[34] R. Scott Nolen, *Labor Shortage Prompts AAEP to Form Workforce Commission*, AVMA (Aug. 17, 2022), https://www.avma.org/news/labor-shortage-prompts-aaep-form-workforce-commission.

[35] Lisa M. Weltzien, *The Livestock Veterinarian Shortage: Implications for Food Safety and Security*, JOHNS HOPKINS CENTER FOR A LIVABLE FUTURE, p. 3 (June 2023), https://clf.jhsph.edu/sites/default/files/2023-06/the-livestock-veterinarian-shortage.pdf.

24

98.     A recent study concluded that 728 counties across the nation (approximately 25% of all counties) had shortages in food animal veterinarians.[36]

99.     Meanwhile, the number of animals being raised for food has dramatically increased in recent years.[37]

100.     Without enough food animal veterinarians, zoonoses—*i.e.*, pathogens that can jump from animals to humans—are much more likely to spread unchecked, compromising public health as well as food safety and affordability.[38] A lack of sufficient food animal veterinarians to provide preventive care also leads to the misuse and overuse of antibiotics, which makes the entire human and animal population vulnerable to untreatable bacterial pathogens.[39]

101.     Given the increases in consumer demand and worsening shortage in the veterinary services market, correspondingly and as would be expected, in the past decade, veterinary care costs have risen more than 60%, almost twice the general rate of inflation.[40]

---

[36] Lisa M. Weltzien, *The Livestock Veterinarian Shortage: Implications for Food Safety and Security*, JOHNS HOPKINS CENTER FOR A LIVABLE FUTURE, p. 6 (June 2023), https://clf.jhsph.edu/sites/default/files/2023-06/the-livestock-veterinarian-shortage.pdf.

[37] Lisa M. Weltzien, *The Livestock Veterinarian Shortage: Implications for Food Safety and Security*, JOHNS HOPKINS CENTER FOR A LIVABLE FUTURE, p. 6 (June 2023), https://clf.jhsph.edu/sites/default/files/2023-06/the-livestock-veterinarian-shortage.pdf.

[38] Lisa M. Weltzien, *The Livestock Veterinarian Shortage: Implications for Food Safety and Security*, JOHNS HOPKINS CENTER FOR A LIVABLE FUTURE, p. 3 (June 2023), https://clf.jhsph.edu/sites/default/files/2023-06/the-livestock-veterinarian-shortage.pdf.

[39] Lisa M. Weltzien, *The Livestock Veterinarian Shortage: Implications for Food Safety and Security*, JOHNS HOPKINS CENTER FOR A LIVABLE FUTURE, p. 28 (June 2023), https://clf.jhsph.edu/sites/default/files/2023-06/the-livestock-veterinarian-shortage.pdf.

[40] *State of Pet Care Study | Pet Parents' Assessment of American Veterinary Care*, GALLUP/PETSMART CHARITIES, p. 15 (Apr. 2025), available at https://www.gallup.com/analytics/659123/gallup-petsmart-charities.aspx.

102.    Recent data indicate that only 47% of pet-owning households spend money on veterinary services in a given year.[41]

103.    More pet-owning households would seek veterinary services but do not do so because of the expense, excessive wait times, difficulty in obtaining appointments, and—in many rural areas—the complete absence of veterinary services.

104.    A 2025 study conducted by Gallup revealed that more than one-third of pet owners decided to forgo needed veterinary services in the past year, or have previously declined care that was recommended by a veterinarian, for financial reasons.[42]

**B.    The AVMA's Protectionist Response to These Market Dynamics**

105.    In line with its stated goal of "protect[ing] and enhanc[ing] the economic well-being of its members,"[43] the AVMA has worked tirelessly to rebut and deny these economic realities, arguing instead that the existing supply of graduates of veterinary schools is more than sufficient to address consumer demand. And most relevant here, the AVMA has advocated that any increase in the supply of graduates of veterinary schools will economically harm the AVMA's membership. The AVMA's advocacy makes clear that it is fully aware that additional schools and students would put downward pricing pressure on veterinary services that would benefit U.S. consumers but would harm the economic interests of the AVMA's members.

---

[41] James W. Lloyd, DVM, Ph.D., *Pet Healthcare in the U.S.: Another Look at the Veterinarian Workforce*, MARS VETERINARY HEALTH, p. 7 (Aug. 1, 2023), https://www.marsveterinary.com/media/uploads/2023/08/Characterizing-the-Need.pdf.

[42] *State of Pet Care Study | Pet Parents' Assessment of American Veterinary Care*, GALLUP/PETSMART CHARITIES, p. 3 (Apr. 2025), available at https://www.gallup.com/analytics/659123/gallup-petsmart-charities.aspx.

[43] *FAQs About the AVMA Council on Education (COE)*, AVMA, https://www.avma.org/education/center-for-veterinary-accreditation/coe-faqs.

106. Under the "Advocacy" section of its website, the AVMA claims that "[u]nfortunately, some estimates circulating for the number of companion animal veterinarians needed in the profession substantially overestimate demand and underestimate supply."[44]

107. In another post under the "Advocacy" section of its website, the AVMA claims that there "will be a significant increase in the number of veterinarians entering the workforce into the 2030s" and that "simply adding more veterinarians to the profession . . . risk[s] steering the veterinary profession in an unsustainable direction."[45]

108. In other commentary, the AVMA has even suggested that any "shortage" in the number of veterinarians reflects merely a "mismatch" in "the price that practices are willing to pay for veterinarians' salaries."[46]

109. As set forth above, in January 2025, the President of the AVMA published this statement:

> The data suggest that the growing number of veterinarians in the United States may eventually outpace future demand for veterinary services. . . . Steady growth is projected over the next several years for three indicators or influencers of demand for veterinary services: consumer expenditures on veterinary services, personal disposable income, and the number of pet-owning households. . . . *However, the growth rate for the supply of veterinarians, based on the current number of veterinary colleges and estimated class sizes, is expected to outpace the projected growth in demand for veterinary*

---

[44] *Workforce: What Is Best for Safe, Quality Animal Care?: Discussing the Risks of a Midlevel Position and Virtual VCPR*, AVMA, https://www.avma.org/advocacy/workforce-what-best-safe-quality-animal-care.

[45] *Future Veterinary Workforce Needs*, AVMA, https://www.avma.org/advocacy/workforce-what-best-safe-quality-animal-care/future-veterinary-workforce-needs.

[46] Malinda Larkin, *Veterinarian Shortage or Salaries Not Keeping Up?*, AVMA (Nov. 25, 2019), https://www.avma.org/javma-news/2019-12-15/veterinarian-shortage-or-salaries-not-keeping.

*services. **What's more, <u>this situation is expected to intensify</u> if 13 proposed new veterinary colleges begin graduating students**.[47]*

110. Similarly, in an October 2024 blog post, the AVMA wrote:

> However, the same cannot be said for the supply of veterinarians. That growth rate, based on the current number of veterinary colleges and estimated class sizes, is expected to diverge from the projected growth in demand for veterinary services.
>
> What's more, ***<u>this situation is expected to worsen</u> if 13 new veterinary colleges start graduating students*** . . . . Beyond 2035, the forecast suggests a looming challenge for the veterinary profession: The expected increase in the number of veterinarians may outpace demand for veterinary services driven by pet ownership, available disposable income, and consumer spending on veterinary services. ***It might require a substantial increase in utilization of veterinary services to comfortably absorb the additional veterinarians—and without that, the economic health of the veterinary profession could be at risk***.[48]

111. And in another AVMA article published in November 2024 and citing a study it had commissioned, the AVMA again claimed that no veterinarian shortage exists, while emphasizing the expected economic effect in the veterinary services market of adding new schools and graduating new veterinarians:

> The study emphasized the likely impact of a rapid expansion in veterinary education on the future supply of veterinarians. "If 13 new schools come onstream in the near future as proposed, ***it will require a significant increase in demand for veterinary services above current trends to absorb the additional supply <u>without downward economic pressure</u>***."[49]

---

[47] Sandra Faeh, DVM, *So, There's a Shortage of Veterinarians? Not So Fast.*, J. AM. VETERINARY MED. ASS'N, Vol. 263, Issue 1, p. 13 (Jan. 2025), https://avmajournals.avma.org/view/journals/javma/263/1/javma.263.1.13.xml?tab_body=pdf (emphasis added).

[48] *Chart of the Month: No Dire Shortage of Veterinarians Ahead*, AVMA (Oct. 17, 2024), https://www.avma.org/blog/chart-month-no-dire-shortage-veterinarians-ahead (emphasis added).

[49] *Existing Veterinary Colleges Adequate to Meet US Companion Animal Veterinary Demand Until At Least 2035, Major New Study Published in JAVMA Finds*, AVMA (Nov. 25, 2024),

112.    The AVMA's economic protectionism is not limited to the addition of new veterinarians in the market. The AVMA has also advocated strongly against both veterinary telemedicine and the creation of new "midlevel practitioner" degrees such as a masters of veterinary clinical care.[50] Both of these positions reflect the express and consistent efforts of the AVMA to restrict the available supply of veterinary services.

113.    Thus, the AVMA, through a variety of means—including statements of its President and the citation of AVMA-commissioned studies—has sought to undermine the voluminous data demonstrating increased consumer demand and worsening shortages, falsely claiming that there is no shortage in the veterinary services market. Yet, on the other hand, the AVMA is simultaneously warning its members of the costs to veterinarians in the form of threatened "downward economic pressure" should additional proposed veterinary schools be allowed to open.

## IV.    The AVMA Targets New and Potential Competitors—Such as LMU—in the Veterinary Education Market

114.    As part and parcel of its intent to restrict output and artificially stabilize prices in the veterinary services market, the AVMA set its sights on LMU, a successful start-up competitor in the veterinary education market that is responsible for the production of candidates for domestic veterinary practice. *See Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 830 (6th Cir. 2011) (characterizing

---

https://www.avma.org/news/press-releases/existing-veterinary-colleges-adequate-meet-us-companion-animal-veterinary (emphasis added).

[50] *AVMA Board Chair Addresses Challenges to VCPR, Advocacy Efforts*, AVMA (Jan. 5, 2024), https://www.avma.org/news/avma-board-chair-addresses-challenges-vcpr-advocacy-efforts (Chairman of AVMA Board of Directors explaining that the AVMA has "lobb[ied] against legislation related to" increased access to telemedicine and the creation of a midlevel practitioner degree). For example, the AVMA spent nearly $1,500,000 in 2024 to oppose a ballot initiative in Colorado to allow midlevel practitioners. *At $14 Million and Counting, Election Reform Measure Is One of Colorado's Most Expensive Ever*, COLORADO NEWSLINE (Oct. 31, 2024), https://coloradonewsline.com/2024/10/31/election-reform-measure-colorado-most-expensive/.

the "exclusion of nascent threats"—*i.e.*, innovative services and business models—as an "especially pernicious" form of anticompetitive behavior).

## A. LMU's Success Story as a College of Veterinary Medicine

115. The Richard A. Gillespie College of Veterinary Medicine at Lincoln Memorial University ("LMU-TN") offers a DVM program based in Harrogate, Tennessee.

116. LMU-TN is an independent, non-profit institution that receives no state subsidies. Its revenues are collected from application fees, tuition fees, technology fees, gifts, grants, research monies, student activity fees, and scholarship fees.

117. LMU-TN is currently the largest provider of veterinary education in the United States, with class sizes of 225 students per class year and a student body that currently represents 4% of all students enrolled across the 34 domestic veterinary schools.

118. LMU-TN is dedicated to providing exceptional veterinary medical education. Since its creation, LMU-TN's commitment to student success, academic quality, innovative education, professional excellence, and community culture has produced veterinary healthcare professionals who fulfill the mission of the University: serving the health and wellness needs of people, animals, and the environment within the Appalachian region and beyond.

119. Although it attracts students from across the nation and globe, approximately 33% of LMU-TN students come from historically underserved and economically deprived areas of Appalachia.

120. In 2014, LMU-TN welcomed the inaugural class of its DVM program, and in 2019, LMU-TN received full accreditation from the AVMA COE.[51] In October 2022, the AVMA COE

---

[51] Malinda Larkin, *Lincoln Memorial Celebrates Accredited Status*, AVMA (Jan. 30, 2019), https://www.avma.org/javma-news/2019-02-15/lincoln-memorial-celebrates-accredited-status.

approved a request by LMU-TN to expand its class sizes from 125 to 225, beginning with the January 2023 matriculating class.

121.    LMU-TN, while it does not have access to enormous sources of capital, has objectively proven to be highly effective at educating and training day-one-ready veterinarians.

122.    LMU-TN graduates average a 90% passage rate on the NAVLE, which all DVM graduates must pass before they can practice.

123.    In fact, as reported by the American Association of Veterinary Medical Colleges in their 2024-2025 Institutional Data Report, for the class of 2024, LMU-TN's NAVLE passage rate was better than or equal to the following currently operating CVMs: University of Illinois, Louisiana State University, Michigan State University, Ohio State University, University of Tennessee, University of Arizona, Tuskegee University, Virginia-Maryland Regional College, and University of Wisconsin-Madison.

124.    Indeed, many institutions have visited LMU-TN in the past five years to expand the *quality* of their curriculum, including Mississippi State University, Michigan State University, and the University of Saskatchewan.

125.    Following its success in Tennessee, LMU announced plans in 2023 to open a second CVM campus in Orange Park, Florida ("LMU-OP"), with planned initial class sizes of 150 students at the LMU-OP campus.

126.    In support of this effort, LMU has already invested millions of dollars in purchasing and renovating facilities for LMU-OP.

**B.    The "Distributive" Model of Veterinary Clinical Education**

127.    LMU utilizes the "distributive" model for veterinary clinical education. The distributive model emphasizes practical, hands-on clinical experience, requiring students to spend

significant amounts of time working with licensed veterinarians at off-campus sites (*e.g.*, veterinary practices, shelters, and diagnostic labs).

128.    Over 20 years ago, beginning with Western University of Health Sciences' College of Veterinary Medicine, new start-up veterinary schools—those without existing research faculty, research buildings, facilities, and labs, state funding, or existing endowments—began innovating ways to get a school off the ground with the distributive educational model.

129.    Distributive model schools focus on preparing their DVM graduates to be career-ready on "day one" through workplace-based clinical education.

130.    The distributive model emphasizes hands-on pre-clinical education to prepare students to enter, participate, and learn in the workplace during their off-campus clinical rotations.

131.    Unlike traditional high research activity institutions with teaching hospitals (*e.g.*, Cornell University) where clinical rotations are completed on campus, the distributive model develops an expansive, nationwide network of clinical affiliates with a variety of species and specialties to which it sends its students for exposure and learning.

132.    These clinical learning sites are approved by the university to ensure good clinical learning environments. Personnel at these sites have undergone training and understand the learning outcomes desired by the university.

133.    Unlike human medicine, post-DVM internships and residencies are not required before entering the professional veterinary workforce.

134.    Indeed, for many companion animal fields of practice, such internship and residency programs are entirely unnecessary.

135.    Relatedly, U.S. distributive model schools often do not offer a full suite of masters or Ph.D. programs on campus.

136. DVM graduates can elect to enter internship and residency programs for specialization. Such internship and residency programs are usually found at traditional high research activity institutions with teaching hospitals and private referral hospitals.

137. The distributive model of education commonly allocates fewer tuition resources to expensive "bench" or lab research initiatives that are found at traditional high research activity institutions with teaching hospitals.

138. Only institutions backed by state governments (*e.g.*, land grant universities like the University of Georgia) or elite private institutions with large endowments (*e.g.*, Cornell University) can afford on-site teaching hospitals or the allocation of huge sums for abstract scientific research.

139. Also of significance, much, if not all, of the huge sums allocated to research by the traditional universities are funded directly by grant money itself and not by tuition. And at most of these schools, a significant portion of the grants received are then allocated to administration, facilities, and faculty salaries—and not to direct research.

140. Obviously, these grant funds are not available to start-up schools just opening their doors, which are instead funded entirely by tuition dollars.

141. For example, Murray State University in Kentucky sought state funding to open a distributive model DVM program. Murray State estimated that constructing a teaching hospital would add $150,000,000 in costs over and above the $89,000,000 needed to establish the planned distributive model program.[52]

---

[52] *Plans for New Veterinary School in Kentucky Stall*, VIN NEWS SERVICE (Apr. 24, 2024), https://news.vin.com/default.aspx?pid=210&Id=12058465&f5=1.

142.     With respect to LMU-TN's DVM program, its achievements are the result of—not in spite of—this distributive model of veterinary education. Practitioners favor LMU-TN graduates because they have already proven that they can succeed in the demanding world of clinical practice and are profitable for their employers from the very start.

143.     In contrast, graduates from traditional DVM programs that emphasize time spent in teaching hospitals and abstract scientific research, though qualified, often take months to develop the practical clinical skills that LMU-TN graduates have on day one.

144.     It is estimated that distributive model graduates will have performed 50 spays or neuters prior to graduation, an impressive milestone within veterinary education.

145.     As a point of comparison, many American medical schools and their accrediting agencies have long embraced the distributive model. In recent years, a majority of new medical schools have chosen this model.

146.     The literature also shows that, as opposed to their colleagues in a traditional model MD or DO program, students at distributive model medical schools treated more patients, performed more procedures, received higher ratings from supervising physicians, and had higher opinions of their learning experiences.

147.     These physicians were also more likely to practice medicine in rural areas.

148.     While the United States is fortunate to have several important research-oriented veterinary schools with teaching hospitals, there is no reason that should be the mission or minimum requirement for every institution.

149.     Nor can or should all students bear the cost of a heavy research emphasis or teaching hospital through their tuition.

150.    Significantly, the AVMA COE has never openly claimed that distributive programs produce less competent graduates—and could not do so because of the indisputable success of these graduates based on objective criteria.

151.    In fact, the AVMA COE has, at times, reluctantly admitted that DVM graduates from distributive programs are as competent as graduates from traditional model programs, *i.e.*, research institutions with teaching hospitals.

152.    Yet, members of the AVMA COE staff, including staff members assigned to facilitate LMU's program reviews, have publicly expressed direct animosity against the distributive model of veterinary education. Indeed, the AVMA COE has only one member affiliated with or trained by a distributive program, and traditionally has had no members affiliated with or trained by a distributive program.

153.    Moreover, as indicated in the chart below, almost all DVM programs in the United States that are accredited or provisionally accredited by the AVMA COE are large research institutions backed by state governments:

| State | Accredited CVMs |
|---|---|
| Alabama | Auburn University<br>Tuskegee University |
| Arizona | Midwestern University<br>University of Arizona |
| California | University of California-Davis<br>Western University of Health Sciences |
| Colorado | Colorado State University |
| Florida | University of Florida |
| Georgia | University of Georgia |
| Illinois | University of Illinois |
| Indiana | Purdue University |
| Iowa | Iowa State University |
| Kansas | Kansas State University |
| Louisiana | Louisiana State University |
| Massachusetts | Tufts University |

| | |
|---|---|
| Michigan | Michigan State University |
| Minnesota | University of Minnesota |
| Mississippi | Mississippi State University |
| Missouri | University of Missouri-Columbia |
| New York | Cornell University<br>Long Island University |
| North Carolina | North Carolina State University |
| Ohio | Ohio State University |
| Oklahoma | Oklahoma State University |
| Oregon | Oregon State University |
| Pennsylvania | University of Pennsylvania |
| Puerto Rico | Universidad Ana G. Mendez |
| Tennessee | University of Tennessee<br>Lincoln Memorial University |
| Texas | Texas A&M University<br>Texas Tech University |
| Virginia | Virginia-Maryland Regional College |
| Washington | Washington State University |
| Wisconsin | University of Wisconsin-Madison |

## C.     The AVMA's Accreditation Standards and Process

154.     To fulfill its accreditation mission, the AVMA COE has established eleven (11) standards veterinary schools must meet to receive initial accreditation and to maintain accreditation every seven years.

155.     These standards are as follows: (1) Organization, (2) Finances, (3) Physical Facilities and Equipment, (4) Clinical Resources, (5) Information Resources, (6) Students, (7) Admission, (8) Faculty, (9) Curriculum, (10) Research Programs, and (11) Outcomes Assessment.

156.     While several of these standards are relevant to this lawsuit, the most significant is Standard 10 (Research Programs), which provides that:

> The college must foster and support an environment and culture of scientific inquiry. The college must maintain substantial research activities of high quality that integrate with and strengthen the professional program, such as basic science, clinical science, *or* scholarship in teaching and learning. Continuing scholarly

productivity within the college must be demonstrated and the college must provide access to opportunities for any interested students in the professional veterinary program to be exposed to or participate in on-going high-quality research. All students must receive training in the principles, application, and ethics of research methods and in the appraisal and integration of research into veterinary medicine and animal health.[53]

157.   The stated intent of this standard is:

Intent: The research standard serves to ensure student exposure to performance of high-quality research and ability to acquire, evaluate and use new knowledge. The development and maintenance of a community of scholars enhances the educational experience for students. DVM students must be introduced to how new knowledge is developed and disseminated and have access to participation in coursework and career development in research.

What to look for: The existence of a college research program that is adequate in scope and quality to expose students to high quality research. Examples of learning objectives may include acquisition and evaluation of scientific literature, experimental and non-experimental design, critical analysis of data, scientific writing including writing of research proposals and submissions of manuscripts for publication, and hands-on experience in bench, clinical, or field research.[54]

158.   The research standard also purports to provide "objective metrics" by which to measure programs, but it includes no actual measuring metrics. Without such measuring metrics, the standard readily allows for arbitrary interpretation and application, thus enabling the implementation of the anticompetitive actions by the AVMA.

159.   Armed with this and the other 10 standards, the AVMA COE's accreditation process proceeds as follows: (a) receipt of a written request for accreditation by a proposed CVM; (b) the AVMA COE's review of the request followed by its agreement to further consider the

---

[53] AVMA COE Policies § 2.1.1 (emphasis added).

[54] AVMA COE Policies § 4.2.5 Appendix I – Comprehensive Site Visit Evaluation Rubric, pp. 182–83.

college for accreditation; (c) receipt and review of appropriate reports submitted by the college; (d) a consultative site visit to determine readiness for full consideration for accreditation; (e) a report to the college identifying any deficiencies in meeting the accreditation standards; (f) correction of any identified deficiencies and request for full consideration; (g) a comprehensive site visit to the college; (h) preparation of a report of evaluation by the AVMA COE's site visit team; (i) review of the report of evaluation by the full Council on Education; and (j) assignment by the full Council of a classification of accreditation.[55]

160.    The "classifications of accreditation" referenced above include the following, as described in the AVMA COE's policies and procedures:

- ***Letter of Reasonable Assurance*** – This is a status awarded to developing colleges in the US and Canada. This recognition allows the College to pursue its plan for the veterinary program, and to admit students. Reasonable Assurance is not a pre-accreditation action, by the Council, and does not confer accreditation of any kind on a developing college.

- ***Provisional Accreditation*** – This is a status awarded a developing college in the US and Canada that has been granted Reasonable Assurance after the College has admitted in its first class.

- ***Accredited*** – This is an accreditation status that is granted to a college that has no deficiencies in any of the Standards. This is awarded for a maximum of 7 years, with interim reporting required.

- ***Accredited with Minor Deficiency(ies)*** – This is an accredited status for a College that has one or more minor deficiencies in one or more of the Standards of Accreditation, and/or that has not materially complied with the Council procedures and/or directives. Minor deficiencies have minimal or no effect on student learning and safety and are readily corrected in one

---

[55] AVMA COE Policies § 3.1.1. Following an initial classification, the AVMA COE's policies further provide for "(k) Interim reports including any changes to the application of Standards – annually for accredited schools, and every six months for those provisionally accredited, granted Reasonable Assurance, on probationary accreditation, or accredited with minor deficiencies; and (l) Reevaluation (self-study and comprehensive site visit) at intervals of no more than seven years or after any major change."

year. The deficiency or deficiencies must be resolved within one year to avoid a change in accreditation status.

- ***Probationary Accreditation*** – This is an accredited status for a College that has one or more major deficiencies in one or more Standards, and/or that has not materially complied with the Council procedures and/or directives. Major deficiencies have more than minimal impact on student learning and safety. The deficiency or deficiencies must be resolved within two years.

- ***Terminal Accreditation*** – This is an accredited status for a College that has not resolved deficiencies within the time allotted, and/or that has not materially complied with the Council procedures and/or directives. Terminal accreditation also can be assigned if the COE feels it is warranted based on information received.[56]

161.    In the event of an adverse decision by the AVMA COE, the affected college has a limited right of appeal based on only three predefined grounds: the AVMA COE "(1) ruled erroneously by disregarding established AVMA COE criteria for accreditation, (2) materially failed to follow its stated procedures, or (3) failed to consider all the evidence and documentation presented. No other grounds for appeal will be allowed."[57]

162.    An appeal may be taken only from an "adverse accreditation decision" by the AVMA COE, defined as "withholding initial or renewed accreditation, administrative withdrawal of accreditation, denial of a reasonable assurance status, or assignment of terminal accreditation."[58] Probationary accreditation is not considered by the AVMA COE to be an "adverse accreditation decision" and there is accordingly no opportunity to appeal from a decision by the AVMA COE to place a school on probationary accreditation status.[59]

---

[56] AVMA COE Policies § 3.1.1.

[57] AVMA COE Policies § 2.5.4.

[58] AVMA COE Policies § 2.5.1.

[59] AVMA COE Policies § 3.2.6.

163.    In the event of an appeal, a seven-person appeals panel is appointed directly by the AVMA Board of Directors,[60] *i.e.*, the same entity that has been pushing a false narrative regarding the shortage of veterinarians in this country while also warning of the dangers of adding new veterinary schools.

164.    In addition to controlling the accreditation status of all domestic veterinary schools, the AVMA COE also controls the class sizes that existing accredited schools are allowed to maintain.[61] Any increase in class sizes of greater than 10%, or that would result in a cumulative increase of 15% or more over any five-year period, requires the AVMA COE's approval and must be requested by the college in the form of a "substantive change request."[62]

## V.    The Effects of the AVMA's Anticompetitive Scheme on LMU-TN

165.    Increasingly and without explanation, the AVMA COE has recently begun to interpret its policies and procedures as demanding that every veterinary school "look like" the elite, high-cost, high research activity institutions with on-site teaching hospitals—no matter how long a school has been opened or at what stage of development the school is. This abrupt shift in approach comes at the same time that the AVMA has started expressing public concerns about the anticipated "downward" effect of new veterinary schools on the prices veterinarians can command in the veterinary services market.

166.    Specifically, in recent years, the AVMA COE has shifted from focusing on how students are exposed to research as a component for career development to insisting on faculty research as a stand-alone activity.

---

[60] AVMA COE Policies § 2.5.1.

[61] AVMA COE Policies § 3.4.1.

[62] AVMA COE Policies § 3.4.1.

167.     With respect to LMU-TN, as outlined above, LMU-TN's campus was allowed to open for students in 2014 and received provisional accreditation customary for new programs until the initial class graduates. The AVMA COE conducted a comprehensive multi-day and multi-location site visit in the spring of 2018 as required. The AVMA COE then granted LMU-TN full accreditation and found the program to be in compliance with the research standard (Standard 10). Annual reports by LMU-TN to the AVMA COE from 2019 to 2023 confirmed LMU-TN's continuing compliance with that standard.

168.     In July 2019, LMU-TN submitted a "substantive change request" to the AVMA COE requesting authorization to add an additional 100 seats to its existing class sizes of 125. In response, the AVMA COE asked LMU-TN to provide "outcomes" data for its upcoming graduate classes first.

169.     In May 2022, after graduating several class years, LMU-TN provided the AVMA-COE with an exhaustive set of outcomes data for its graduates. That data showed exceptional success by LMU-TN in preparing its graduates for "day one" success in practicing veterinary medicine. The data revealed, among other things, that: (1) LMU-TN's students consistently achieve high clinical competency scores; (2) the NAVLE passage rates of LMU-TN's graduates are well above the threshold required by the AVMA COE to meet accreditation standards; and (3) of the alumni of LMU-TN's first four graduating classes (2018–2021) who reported employment outcomes, 100% are employed in the veterinary field.

170.     Notably, in the same submission to the AVMA COE from May 2022, LMU-TN did not indicate that it had increased, or had any plans to increase, access to additional extramural grants for its research program. Nor did LMU-TN indicate that it intended to hire any additional faculty dedicated to research or increase the quantity of its faculty's research output.

171.    Nonetheless, the AVMA COE approved LMU-TN's substantive change request at its September 2022 meeting and notified LMU-TN of that approval in an October 2022 letter. The approval letter did not express *any* concerns about the quality or quantity of LMU-TN's research offerings.

172.    Having obtained the AVMA COE's approval to do so, LMU-TN added an additional 100 students to its class sizes beginning with the January 2023 matriculating class. With this change in effect, LMU-TN's overall enrollment is anticipated to increase from its current number of 669 students to 900 students by the fall of 2027, by which time the expansion in class size would be reflected across all four years of LMU-TN's student body. Again, this increased enrollment was allowed by the AVMA COE in 2022 **with no mention of a need for increased research resources**.

173.    All of the prior findings and determinations by the AVMA COE—including its repeated reaffirmance of LMU-TN's compliance with accreditation standards and its decision to allow the expansion of LMU-TN's class sizes without requiring any adjustments to LMU-TN's research offerings—were entirely appropriate and warranted.

174.    Although it does not have the funding or facilities to provide extensive research-oriented models of education, LMU-TN is able to provide access to research careers and myriad opportunities for students to participate in research. And it does so without spending the hundreds of millions of dollars on programs and initiatives that are not relevant to the great majority of students who will become general practitioners in the pet healthcare or food animal sectors. By way of example, LMU-TN successfully partners with other research-based institutions to expose its students to research opportunities in the field.

175.     Consistent with the AVMA COE's research standard, LMU-TN's research initiatives are of high quality and are integrated into and strengthen LMU-TN's CVM program.

176.     First, LMU-TN has several centers of research excellence, including the Core Laboratory for Metabolomics and Lipidomics, the Center for Animal and Human Health in Appalachia, the Center for Innovation in Veterinary Education and Technology, and the Center for Infectious, Zoonotic, and Vector-Borne Diseases.

177.     Additionally, LMU-TN has a formal relationship with the University of Kentucky to allow LMU-TN students to participate in cutting-edge research at the world-renowned Gluck Equine Research Center and University of Kentucky Veterinary Diagnostic Laboratory.

178.     LMU-TN students regularly present their research at national and international conferences.

179.     A significant number of LMU-TN students have authored or co-authored research papers published in the last 10 years.

180.     Second, LMU-TN students are informed about research opportunities throughout the year. Students participate in research during their summer breaks and during the semester. All students must attend the college-wide Research Day as first- and second-year students. Research Day allows students to present findings from the research projects they participated in during the previous year, with an average of 60 students presenting each year.

181.     Students are introduced to the importance of research as a cornerstone of the veterinary profession through a course in their first year of study called Evidence-Based Veterinary Medicine. Evidence-based veterinary medicine (EBVM) promotes the application of peer-reviewed data to answer clinical questions. Students continue to apply those EBVM critical

43

thinking skills throughout the program with additional formative assessments occurring in the clinical year.

182. Third, LMU-TN meticulously collects research output data on a yearly basis for inclusion in accreditation reports.

183. Again, in 2022, these LMU-TN research resources were deemed adequate by the AVMA COE. But that was about to change.

184. In 2024, *at the same time* as the AVMA began to decry a future glut of veterinarians and the threat of "downward economic pressure" on the market, the AVMA COE moved the goalpost on LMU-TN.

185. The change started with a "focused" site visit by the AVMA COE to LMU-TN's campus in February 2024, the ostensible purpose of which was to review LMU-TN's continued compliance with accreditation standards in light of the increase in LMU-TN's class sizes beginning in January 2023, a change that, as explained above, had already been approved by the AVMA COE. The stated purpose of this "focused" visit was *not* to reassess LMU-TN's research program.

186. Nonetheless, the AVMA COE utilized this site visit as the vehicle for generating a new set of purported major "deficiencies" in LMU-TN's research program. As a result, on October 24, 2024, the AVMA COE placed LMU-TN on probationary accreditation status for a claimed "major deficiency in Standard 10 – Research." This determination represented a dramatic change in course by the AVMA COE with respect to its evaluation of LMU-TN, which had maintained full accredited status with the AVMA COE since 2019 without incident.

187. The AVMA COE's sudden allegations of a "research deficiency" in LMU-TN's programming are arbitrary; are a complete about-face from the AVMA COE's previous stance with respect to LMU-TN; and are entirely unrelated to the education of day-one-ready

veterinarians. A close look at the "compliance failures" highlighted by the AVMA COE reveals no connection to student engagement or learning. Instead, the claimed "failures" relate solely to limited faculty research productivity and lack of extramural grant funding—emphases that are *entirely absent* from the AVMA COE's research standard (Standard 10) *as written*.

188. In the October 2024 report in which it determined that LMU-TN would be placed on probationary accreditation status, the AVMA COE focused largely on the level of LMU-TN's "stand-alone" academic research output. For example, the AVMA COE criticized the fact that "[f]orty-seven of 58 LMU CVM faculty have a research FTE less than 20%, and only 6 of 58 with greater than 50% research FTE," noting that "[a]lthough the CVM plans to add 11 more faculty by July 2025, these will be devoted to teaching and will not have a high research appointment."

189. Similarly, the AVMA COE took issue with the fact that, "[i]n 2023, 58 [LMU-TN] faculty had 35 unique publications and 5 book chapters," claiming that "[p]resentation of original research in scientific meetings, poster sessions and publication of abstracts" and "[i]nvolvement in external research panels and editorial boards" were "limited."

190. The AVMA COE also took issue with the level of LMU-TN's extramural grant funding, noting that "[o]ver the last 5 years there have been 2 federal extramural grants with no awards in the last two years and only 2 state extramural grants during that same time," while "[g]reater than 90% of grant funding comes from intramural funds, which are awarded by the LMU Research Committee."

191. The AVMA COE summarized its findings as follows: "In summary, the number of faculty engaged in research, the extramural research grants obtained and the research projects, publications, and presentations are limited in quantity and scope, and do not reflect a robust, high-quality research program commensurate with the College enrollment. There is limited extramural

funding and faculty FTE devoted to research to support the quantity and quality of research effort necessary to meet the standard, especially in light of the projected enrollment increases."

192.    As is evident, the AVMA COE only commented on the quantity of the LMU-TN research, not the quality. Nor did they give any explanation as to how this new standard holds any relevance to the quality of graduating students preparing to enter the field as providers of veterinary medicine. There is no metric in the research standard to support the conclusions of the AVMA COE findings with regard to research output; there is no definition for the number of faculty that must be involved in research; there is no defined amount of research output based on enrollment; there is no standard for the number of faculty who must be engaged in a high research appointment; there is no stated amount of extramural funding a college must be awarded; and there is no standard as to how this applies to the readiness of students.

193.    Thus, demonstrating that the AVMA COE's heavy emphasis on funding for abstract research activities is a pretext for limiting the development of new veterinary programs, the AVMA COE has been unable or unwilling to articulate its newly required levels of research funding necessary to remove LMU-TN's probationary status.

194.    Furthermore, while LMU-TN's mission and programs include substantial research, LMU does not fall into the "R1" or "R2" research categories, which makes it impossible to compete effectively for large extramural grants (such as grants from the NIH or FDA) as the AVMA COE demands in its findings. Accordingly, by necessity, research at LMU-TN is completed primarily through intramural grants, which are funded through student tuition.

195.    These are all pretextual findings to justify the eventual de-accreditation of LMU-TN and to further the AVMA's conspiracy to increase prices for veterinary services on behalf of its members. The AVMA COE is an accreditor of veterinary education, not veterinary research.

46

The AVMA COE's sole mission with regard to veterinary medical education is to make sure schools produce confident, competent, career-ready graduates, not to mandate the size of research program output as measured by extramural funding and the number of publications and presentations.

196. Thus, the AVMA COE has suddenly changed its application of its research standard to now require that LMU-TN provide levels of academic research on par with existing accredited research institutions with teaching hospitals. But such demands directly conflict with the AVMA COE's own policies, which provide that "[t]he [AVMA COE] encourages differences and education innovation. The site team will not compare programs with other veterinary colleges. Each team member must judge only the college being visited in the context of its mission and educational objectives as presented in the self-study."[63] The AVMA COE's stated mission is not to serve as the arbiter of the types or volume of research being conducted by veterinary schools, but to ensure that research is incorporated in some manner into the curriculum—which has plainly been done at LMU-TN.

197. The AVMA COE has harmed LMU-TN by placing it on probationary accreditation as of October 2024 despite *no material change* to LMU-TN's research resources, which previously had been deemed satisfactory by the AVMA COE. That act in and of itself has resulted and will continue to result in negative reputational effects on LMU-TN's program, placing a cloud over LMU-TN that affects employers, faculty, staff, and students. The harms to LMU-TN from its public placement on probation include lost revenues, decreased ability to recruit faculty, and increased difficulty in securing grants and donations and economic opportunities for the school and its faculty.

---

[63] AVMA COE Policies § 2.3.9.

198.    Even worse, by the terms of the AVMA COE's own policies, probationary status is a necessary step and precursor to a later determination to place a school on "terminal" accreditation if the purported deficiencies are not resolved within two years—in LMU-TN's case, by October 2026. A school that is placed on terminal accreditation is disallowed from matriculating new students.[64]

199.    The AVMA COE's decision to place LMU-TN on probationary accreditation threatens LMU-TN's very existence as an operating CVM, with the likely effect being that the AVMA COE will terminate LMU-TN's accredited status altogether at its earliest opportunity. Such a result would have obvious devastating effects on LMU-TN, as it would result in the total exclusion of LMU-TN from the veterinary education market.

200.    The harms to competition from LMU-TN's placement on probationary accreditation and its eventual exclusion from the veterinary education market altogether are tremendous. As noted, LMU-TN's students currently make up approximately 4% of the veterinary education market, making LMU-TN the largest provider of veterinary education in the country, and one of the most successful, with outstanding NAVLE passage rates by its graduates emerging from its innovative distributive model program.

201.    A number of proposed veterinary education programs (those with similarly limited financial resources) spread across the United States are focused on and have studied the success of LMU-TN with applicants, job placements, starting salaries, NAVLE scores, clinical training through distributive rotations and research focused on student experiences and awareness of career options. These programs are resource-limited and cost-conscious and view the LMU model as financially sound, tested, and replicable.

---

[64] AVMA COE Policies § 3.2.7.

202.    The publicly accessible manner in which the AVMA COE is arbitrarily penalizing LMU-TN, especially with respect to bench research, faculty demands, and extramural grants, is intentionally discouraging the development of other new schools. And of course, the threatened exclusion of LMU-TN from the veterinary education market altogether would result in the sudden disappearance of a significant percentage of the overall number of students seeking DVM degrees and subsequently becoming practicing veterinarians, would further reduce and restrict the supply of veterinarians, and would further elevate prices above competitive levels.

## VI.    The Effects of the AVMA's Anticompetitive Scheme on LMU-OP

203.    In 2023, seeking to spread the success of its distributive program to new locations in need of veterinarians, LMU announced that it was planning to open its second distributive model CVM campus, LMU-OP.[65] LMU plans to enroll students at LMU-OP beginning in 2026 with initial class sizes of 150 students per year, with overall capacity for 450 students across three class years.

204.    After LMU announced plans to open the LMU-OP campus, the AVMA COE conducted a "consultative" site visit in November 2023 (which was overall positive) and a "comprehensive" site visit in January 2025. As with the AVMA COE's decision to place LMU-TN on probation in October 2024, the timing of the AVMA COE's January 2025 review of LMU-OP closely aligns with the AVMA's ramp-up in 2024 and 2025 of its public campaign to minimize the significance of the growing shortage of veterinarians while publicly expressing concerns about the "downward economic pressure" that new veterinary schools would inflict on the veterinary services market.

---

[65] Nikki Lockhart, *LMU Planning New College of Veterinary Medicine in Orange Park, Florida*, LINCOLN MEMORIAL UNIVERSITY (Aug. 2, 2023), https://www.lmunet.edu/news/2023/08/LMUPlanningNewCVM.

205. Similar to its pretextual decision to put LMU-TN on probationary status, the AVMA COE has made clear its conclusion that LMU-OP does not pass muster under the AVMA COE's current arbitrary interpretation of its research standard. As a result, LMU-OP cannot begin accepting students or get on track for accreditation, despite its already-incurred multi-million-dollar investment in the school.

206. The AVMA COE's position with respect to LMU-OP is detailed in its "Report of Evaluation for a Comprehensive Visit for a Letter of Reasonable Assurance" (the "ROE"), which was provided to LMU following the AVMA COE's January 2025 comprehensive site visit.

207. The AVMA COE's ROE claims that LMU-OP has serious deficiencies in three main areas: (1) research activity, (2) the opportunity for "direct experiences" with interns and residents, and (3) a need to add additional faculty members.

208. With respect to the AVMA COE's negative evaluation of LMU-OP's planned research activity, it is clear that the AVMA COE is not following its own requirements outlined in its research standard (Standard 10).

209. As written, the research standard focuses on the requirement that research relate to and inform the student experience and learning.

210. For LMU-OP, the AVMA COE is instead imposing a requirement that stand-alone research be maintained and funded by the college and at levels the AVMA COE cannot articulate.

211. For example, the AVMA COE commented critically that LMU-OP intended to develop veterinary education research capabilities and not basic science/laboratory research faculty and facilities. This distinction ignores the plain language of Standard 10, equating those two types of research in veterinary schools.

212. Similar to LMU-TN, the AVMA COE's approach to LMU-OP's accreditation is based on the quantity of faculty research productivity, which is not rationally related to the AVMA COE's mission to prepare day-one-ready veterinarians. For example, the AVMA COE's ROE stated that LMU-OP's plan to have 5.2 full-time equivalent ("FTE") faculty members involved in research "is not sufficient to establish and maintain a substantial, high-quality level of faculty research activity commensurate with the planned enrollment." The AVMA COE did not articulate an objectively satisfactory number of FTE faculty members that it requires to be involved in research.

213. As another example, LMU-OP proposed that its faculty involved in research should be expected to author at least two publications every two years. The AVMA COE rejected this plan as being insufficient, but again offered no objectively satisfactory number of publications.

214. The AVMA COE also rejected LMU-OP's plan for applying for extramural research grants because that plan did not identify how many extramural research grants LMU-OP faculty would actually *receive*. This is an unknowable number because (1) LMU-OP has not yet hired all of its faculty (and could not possibly do so at this early stage) and (2) research output and the funding necessary for research are highly dependent on the individuals who are ultimately hired for the faculty and the availability of these grants from the NIH and FDA.

215. Unsurprisingly, newer academicians struggle to attract research funding outside their institution. This challenge will become more difficult as the NIH and other federal agencies— key sources of research funding—prepare to make unprecedented cuts.

216. The AVMA COE's application of its research standard to require allocation of student tuition toward funding "substantial, high-quality" research is also inconsistent with the broader financial and educational priorities of the CVM program and cannot be reconciled with

other of the AVMA COE's accreditation standards emphasizing responsible financial stewardship and affordability.[66]

217.   Yet, the AVMA COE has declared emphatically that accreditation is not possible "without a high-quality faculty research program" on campus.

218.   Relatedly, in the ROE, the AVMA COE is requiring that all LMU-OP "***students must*** have direct experiences with veterinarians who are in post-DVM programs, including internships and residencies, to provide understanding of these career paths. Experiences with interns and residents ***must include experiences in a clinical setting***."

219.   As the AVMA COE is well aware, it is unrealistic for schools that do not have an on-site teaching hospital to fulfill this requirement. Except as an anticompetitive barrier, a requirement that ***all*** DVM students have the opportunity to interact with residents and interns in a clinical setting serves no reasonable purpose and is arbitrary and capricious. Having veterinary medical students shadow and observe recent DVM graduates working as residents and interns is of marginal practical value for most students compared to exposure to the real-world demands of a busy private clinic.

220.   The AVMA COE's shifting approach to its research standard as applied to LMU from 2023 through today coincides with the timing of the AVMA's intensification of its rhetoric regarding the lack of a shortage of veterinarians and the likely "downward economic pressure" that would result from allowing accreditation of additional veterinary schools.

221.   What is more, as further evidence that the AVMA COE is not an impartial decision-maker, an AVMA COE member who served as an observer to the LMU-OP site visit participated

---

[66] AVMA COE Policies § 4.2.1 Appendix E – Self Study Guidelines, p. 115.

in interviews with LMU-OP's faculty, staff, and students and contributed to the site visitors' deliberations, in direct violation of the AVMA COE's own policies and procedures.[67]

222.    The AVMA COE's threatened denial of accreditation to LMU-OP will have obvious devastating effects on LMU-OP, as it would result in the total exclusion of LMU-OP from the veterinary education market.

223.    The harms to competition from the threatened exclusion of LMU-OP from the veterinary education market are similarly significant. LMU-OP's planned enrollment of 450 students across three class years would—in and of itself, and without considering LMU-TN's existing market share—add approximately 3% increased capacity to *the entire domestic veterinary education market*. The AVMA COE's anticipated denial of accreditation to LMU-OP thus will result in a significant restriction in output in the veterinary education market and is already dissuading other potential market entrants from expending the tremendous resources necessary to open other new veterinary schools. The predictable result will be fewer graduates and less competition (in the education market) and fewer veterinarians and higher prices for services (in the services market).

**CAUSES OF ACTION**

**COUNT I**
**Violation of the Sherman Act – 15 U.S.C. § 1**
**Unreasonable Restraint of Trade in the Veterinary Services Market**

224.    Plaintiff incorporates by reference the allegations of Paragraphs 1 through 223 above.

---

[67] AVMA COE Policies § 2.3.8.

225. Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits contracts, combinations, or conspiracies in restraint of trade. A violation of Section 1 is subject to a private right of action for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

226. The AVMA, through its members and officers, have unlawfully agreed to block new sources of veterinarians (*i.e.*, new veterinary schools) in order to artificially prevent the supply of new veterinarians from meeting the rising demand for veterinary services, with the purpose and effect of unreasonably restraining interstate trade and commerce. *See Realcomp II*, 635 F.3d at 824–25 (finding that an association's website policy constituted a contract, combination, or conspiracy among its members).

227. The AVMA, through its officers and members, is the same entity as the AVMA COE and controls the decisions thereof.

228. The unlawful combination and conspiracy consists of an agreement, understanding, and concert of action among those implementing the AVMA COE's accreditation program and other conspirators. The substantial terms are to restrain trade and hinder competition in the delivery of veterinary education. *See Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982) ("Furthermore, a standard-setting organization like ASME can be rife with opportunities for anticompetitive activity. Many of ASME's officials are associated with members of the industries regulated by ASME's codes. Although, undoubtedly, most serve ASME without concern for the interests of their corporate employers, some may well view their positions with ASME, at least in part, as an opportunity to benefit their employers. When the great influence of ASME's reputation is placed at their disposal, the less altruistic of ASME's agents have an opportunity to harm their employers' competitors through manipulation of ASME's codes.").

229.     Specifically, the AVMA's arbitrary and unreasonable interpretation and implementation of the AVMA COE's accreditation standards constitutes a group boycott that unreasonably restrains trade and has no procompetitive justifications. *See Associated Press v. United States*, 326 U.S. 1, 15 (1945) ("The Sherman Act was specifically intended to prohibit independent businesses from becoming 'associates' in a common plan which is bound to reduce their competitor's opportunity to buy or sell the things in which the groups compete."); *Allied Tube*, 486 U.S. at 500 ("Agreement on a product standard is, after all, implicitly an agreement not to manufacture, distribute, or purchase certain types of products. Accordingly, private standard-setting associations have traditionally been objects of antitrust scrutiny."); *Kreuzer v. Am. Acad. of Periodontology*, 735 F.2d 1479, 1490 (D.C. Cir. 1984) ("Because the evidence amply indicates that various officers and members of the AAP acted in concert to enforce the limited practice requirement, we need not dwell long in our consideration of the threshold inquiry. There can be no doubt that a conspiracy existed within the AAP to deny Dr. Kreuzer's application for active membership.").

230.     As further evidence of the agreement to restrict the number of veterinary schools and the number of their graduates, and in addition to the AVMA's interpretation and implementation of its accreditation standards, the Court need look no further than the AVMA's own public-facing words describing how the supply of veterinary graduates must be artificially restricted to avoid downward economic pressure. *Supra* at 109–11. For example, the U.S. Supreme Court has cited the following very similar statement by a trade association as clear evidence of anticompetitive behavior: "We are fighting an economic war where the very survival of our profession is at stake." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 450 n.1 (1986).

231. The timing and sudden shift in focus by the AVMA COE in evaluating LMU's CVM programs in 2024 and 2025 only further indicates that the AVMA is carrying out an anticompetitive agreement among its members to restrict the number of veterinary schools and the number of their graduates. As explained above, the AVMA COE started identifying purportedly "major deficiencies" in LMU's research programs at the same time that the AVMA started expressing public concerns about the "downward economic" effect that new veterinary schools will have on the prices charged in the veterinary services market. *Supra* at 183–86, 204.

232. Veterinary school graduates enter the veterinary services market, thereby increasing supply in the market and effecting downward pressure on prices for veterinary services. In order to carry out its ends, the conspiracy among the AVMA's members and officers naturally requires that veterinary schools be limited in their ability to increase the size of their student bodies, be forced to close, or be prevented from opening. Because of this direct connection to the conduct alleged and the veterinary services market, the injury and threatened injury to LMU as a result of the anticompetitive acts of the conspirators is inextricably intertwined with the injury the conspirators seek to inflict on the market for veterinary services. *See McCready*, 457 U.S. at 483–84.

233. The group boycott orchestrated by the AVMA substantially restrains and injures competition in the veterinary services market and will continue to do so absent the injunctive relief LMU seeks.

234. Specifically, the group boycott results in the restriction of output of candidates for veterinary practice, resulting in increased costs to consumers forced to pay artificially high veterinarian prices.

235.    As a result of this conspiracy, LMU-TN has been harmed as a result of its placement on probationary accreditation, while both LMU-TN and LMU-OP are threatened with total exclusion from the veterinary education market. LMU has suffered the type of injury the antitrust laws are intended to prevent in a market in which it competes.

236.    The threatened exclusion of LMU-TN and LMU-OP from the veterinary education market as a result of this illegal group boycott is having and will continue to have a direct impact on competition in the veterinary services market by continuing to limit the number of candidates for veterinary practice in the United States, resulting in artificially increased costs for veterinary services to the detriment of consumers.

237.    The AVMA's actions constitute a group boycott that is *per se* illegal under the Sherman Act. *See Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1012 (6th Cir. 1999) ("Generally speaking, group boycotts and refusals to deal are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations." (citation omitted)).

238.    In the alternative, the AVMA's conduct is unlawful under the "quick look" doctrine, because an observer with even a rudimentary understanding of economics would conclude that the conduct in question would have an anticompetitive effect on the market.

239.    In the alternative, the AVMA's conduct also violates the rule of reason, as there are no procompetitive justifications for erecting arbitrary, insurmountable barriers to entry that block new competition in the veterinary education market and result in restricted output in the veterinary services market.

240.    As set forth above, the AVMA has market power in the market for veterinary services, due to its ability to restrict the output of candidates for veterinary practice.

241.    The AVMA has not and cannot advance any substantial, consistent, or even minimally procompetitive justification for its arbitrary interpretation and application of its accreditation standards with respect to LMU. And even if the AVMA could advance any procompetitive justification for its actions, those actions would not constitute the least restrictive means of carrying out the AVMA's stated mission of ensuring the entry-level competency of graduates of veterinary schools.

242.    In no way does the AVMA's group boycott assure that the public will receive better-quality, or lower-cost, veterinary services. All it does is artificially lessen supply to the substantial advantage of AVMA's members.

243.    The activities of the AVMA as alleged herein are continuing.

244.    Permanent injunctive relief is required to prevent the harm alleged and because monetary damages will be inadequate to compensate LMU for the irreparable harm it will continue to suffer absent such relief.

### COUNT II
### Violation of the Sherman Act – 15 U.S.C. § 1
### Unreasonable Restraint of Trade in the Veterinary Education Market

245.    Plaintiff incorporates by reference the allegations of Paragraphs 1 through 223 above.

246.    Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits contracts, combinations, or conspiracies in restraint of trade. A violation of Section 1 is subject to a private right of action for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

247.    As set forth above, the AVMA, through its members and officers, have unlawfully agreed to block new sources of veterinarians (*i.e.*, new veterinary schools) in order to artificially prevent the supply of new veterinarians to meet the rising demand for veterinary services, with the purpose and effect of unreasonably restraining interstate trade and commerce. *Supra* at 226–31.

58

248.     In order to carry out its ends, the conspiracy among the AVMA's members and officers requires that veterinary schools be limited in their ability to increase the size of their student bodies, be forced to close, or be prevented from opening.

249.     The group boycott orchestrated by the AVMA substantially restrains and injures competition in the veterinary education market and will continue to do so absent the injunctive relief Plaintiff seeks.

250.     Specifically, the group boycott results in the restriction of the number of domestic veterinary schools, resulting in less competition among existing schools.

251.     As a result of this conspiracy, LMU-TN has been harmed as a result of its placement on probationary accreditation, while both LMU-TN and LMU-OP are threatened with total exclusion from the veterinary education market. LMU has suffered the type of injury the antitrust laws are intended to prevent in a market in which it competes.

252.     The threatened exclusion of LMU-TN and LMU-OP from the veterinary education market as a result of this illegal group boycott is having and will continue to have a direct impact on competition in the veterinary education market by continuing to limit the number of operating veterinary schools in the United States and the number of students they can graduate, resulting in reduced competition for students at domestic veterinary schools.

253.     The AVMA's actions constitute a group boycott that is *per se* illegal under the Sherman Act. *See Re/Max Int'l*, 173 F.3d at 1012.

254.     In the alternative, the AVMA's conduct is unlawful under the "quick look" doctrine, because an observer with even a rudimentary understanding of economics would conclude that the conduct in question would have an anticompetitive effect on the market.

255. In the alternative, the AVMA's conduct also violates the rule of reason, as there are no procompetitive justifications for erecting arbitrary, insurmountable barriers to entry that block new competition in the veterinary education market.

256. As set forth above, the AVMA has market power in the market for veterinary education, due to its ability to restrict the number of veterinary schools (as well as the number of seats at each of those schools).

257. The AVMA has not and cannot advance any substantial, consistent, or even minimally procompetitive justification for its interpretation and application of its accreditation standards with respect to LMU. And even if the AVMA could advance any procompetitive justification for its actions, those actions would not constitute the least restrictive means of carrying out the AVMA's stated mission of ensuring the entry-level competency of graduates of veterinary schools.

258. In no way does the AVMA's group boycott assure that students will receive better-quality, or lower-cost, veterinary education.

259. The activities of the AVMA as alleged herein are continuing.

260. Permanent injunctive relief is required to prevent the harm alleged and because monetary damages will be inadequate to compensate LMU for the irreparable harm it will continue to suffer absent such relief.

**COUNT III**
**Violation of the Sherman Act – 15 U.S.C. § 2**
**Unlawful Use of Monopoly Power**

261. Plaintiff incorporates by reference the allegations of Paragraphs 1 through 223 above.

262. Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits monopolization, attempts to monopolize, or conspiracies to monopolize interstate commerce. A violation of Section 2 is subject

60

to a private right of action for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

263. To succeed on a claim under Section 2 of the Sherman Act, a plaintiff "must show (1) the possession of monopoly power in a relevant market, and (2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means as opposed to growth or development resulting from a superior product, business acumen, or historic accident." *ACT, Inc. v. Worldwide Interactive Network*, No. 3:18-cv-186, 2020 WL 12574235, at *2 (E.D. Tenn. Mar. 24, 2020) (citation omitted). The plaintiff "must also show (3) the alleged violation tended to reduce competition overall, and (4) the claimant's injury was a consequence of the resulting diminished competition." *Id.* (citation omitted).

264. The AVMA, through the AVMA COE, possesses monopoly power in the U.S. market for the provision of accrediting services for domestic veterinary schools.

265. The AVMA has utilized its monopoly power in the veterinary accreditation market to restrict output in both the veterinary education market (by reducing the number of veterinary schools) and the veterinary services market (by reducing the number of candidates for veterinary practice).

266. Specifically, by utilizing its monopoly power in the veterinary accreditation market to restrict output in the veterinary education and services markets, the AVMA has engaged in the unlawful "leveraging" of its "monopoly power in one market to amplify or 'leverage,' a position in another competitive market." *Kerasotes Mich. Theatres, Inc. v. Nat'l Amusements, Inc.*, 854 F.2d 135, 137 (6th Cir. 1988) (citation omitted).

61

267.    The AVMA's leveraging of its monopoly power in the veterinary accreditation market for the benefit of its members has tended to reduce competition overall in both the veterinary education market and the veterinary services market.

268.    LMU-TN's injuries from its placement on probationary accreditation status, and LMU-TN and LMU-OP's threatened exclusion altogether from the veterinary education market, are a direct result of the AVMA's efforts to reduce competition and unlawful leveraging of its monopoly power.

269.    The activities of the AVMA as alleged herein are continuing.

270.    Permanent injunctive relief is required to prevent the harm alleged and because monetary damages will be inadequate to compensate LMU for the irreparable harm it will continue to suffer absent such relief.

**COUNT IV**
**Violation of Due Process – Federal Common Law**

271.    Plaintiff incorporates by reference the allegations of Paragraphs 1 through 223 above.

272.    "'Quasi-public' professional organizations and accrediting agencies . . . have a common law duty to employ fair procedures when making decisions affecting their members." *Thomas M. Cooley L. Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 711 (6th Cir. 2006). Under principles of federal common law, courts review "whether the decision of an accrediting agency . . . is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence." *Id.* at 712. The "focus" in this determination is "on whether the agency conformed its actions to fundamental principles of fairness." *Id.* at 713 (citation omitted and alteration adopted).

273. LMU is in compliance with the AVMA COE's standards for accreditation as reasonably interpreted and applied, consistent with the AVMA COE's stated mission of ensuring entry-level competency in graduates of veterinary schools.

274. Specifically, as detailed above, LMU is in substantial compliance with the AVMA COE's accreditation standards, and in particular the research standard (Standard 10), absent the AVMA's artificially heightened and arbitrary insistence on research faculty, curriculum, facilities, and extramural grants as well as student access to residents and interns.

275. The AVMA's decision that LMU is not in substantial compliance with the AVMA COE's standards for accreditation regarding research faculty, curriculum, facilities, extramural grants, and access to interns and residents is, as a result, arbitrary and capricious and a denial of due process.

276. The AVMA COE's actions with respect to LMU are not rationally related to the minimum necessary education standards that the AVMA COE is assigned with maintaining pursuant to its authorization by the U.S. Department of Education.

277. The timing and sudden shift in focus by the AVMA COE in evaluating LMU's CVM programs in 2024 and 2025 only further indicates that LMU is being treated arbitrarily, capriciously, and unreasonably. Prior to October 2024, LMU operated its existing CVM program in Tennessee for years without the AVMA COE claiming any purported significant "deficiencies" in its research offerings. The AVMA COE's sudden change in course further indicates that LMU has suffered a denial of due process.

278. Moreover, as described above, the AVMA COE is not an impartial decision-maker. Its impartiality is evidenced by the AVMA's repeated statements signaling its opposition to the

63

accreditation of new veterinary schools and its public position that adding veterinarians to the market will impose downward economic pressure on the profession as a whole.

279. As a result, LMU is being denied due process in the AVMA's review of its accreditation.

280. The activities of the AVMA as alleged herein are continuing.

281. Permanent injunctive relief is required to prevent the harm alleged and because monetary damages will be inadequate to compensate LMU for the irreparable harm it will continue to suffer absent such relief.

## RELIEF SOUGHT

**WHEREFORE**, Plaintiff Lincoln Memorial University demands judgment against the AVMA and seeks the following relief:

(a) Enjoining the AVMA from applying the AVMA COE's accreditation standards, including its research standard, in a manner more restrictive than necessary for new and existing veterinary medical education programs to graduate students with entry-level competency to be practicing veterinarians;

(b) Entry of an order requiring a total and complete separation of the AVMA COE's powers of accreditation from the AVMA and the creation of a separate, unbiased entity that is not operated by a trade association with inherently inconsistent economic incentives;

(c) Enjoining the AVMA from applying the AVMA COE's accreditation standards in an arbitrary, capricious, and inconsistent manner, including, but not limited to, in the implementation of the AVMA COE's research standard;

(d) LMU be awarded its costs of suit, including its reasonable attorneys' fees;

(e)     LMU be awarded all other legal and equitable relief to which it may be entitled.

Plaintiff demands a jury trial on all claims and issues triable to a jury.


Respectfully submitted this 18th day of June, 2025.


Respectfully submitted,

*/s/ Thomas W. Thagard III*
Thomas W. Thagard III (TN 041673)
James C. Lester (*pro hac vice* forthcoming)
S. Reeves Jordan (*pro hac vice* forthcoming)
William B. Grimes (*pro hac vice* forthcoming)
MAYNARD NEXSEN PC
1901 Sixth Avenue North, Suite 1700
Birmingham, AL 35203
T: (205) 254-1000
tthagard@maynardnexsen.com
jlester@maynardnexsen.com
rejordan@maynardnexsen.com
bgrimes@maynardnexsen.com

Timothy B. McConnell (TN 019136)
MAYNARD NEXSEN PC
4800 Old Kingston Pike, Suite 120
Knoxville, TN 37919
T: (865) 686-5624
tmcconnell@maynardnexsen.com

*Counsel for Plaintiff Lincoln Memorial University*