**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION**

LINCOLN MEMORIAL UNIVERSITY,

     Plaintiff,

v.

AMERICAN VETERINARY MEDICAL
ASSOCIATION,

     Defendant.

Case No. 3:25-cv-00282-TAV-DCP

## <u>BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................... 1

II. FACTUAL ALLEGATIONS AND CLAIMS ASSERTED ...................................... 4

    A.   The AVMA and the COE ...................................................................... 4

    B.   The DVM Accreditation Process ........................................................... 5

    C.   LMU's Accreditation Status ................................................................. 8

    D.   Claims Asserted and Relief Requested ................................................ 10

III. MOTION STANDARDS ........................................................................................ 11

    A.   Lack of Subject-Matter Jurisdiction under Rule 12(b)(1) .................... 11

    B.   Failure to State a Claim under Rule 12(b)(6) ...................................... 11

IV. ARGUMENT ......................................................................................................... 12

    A.   LMU's Claims are Not Ripe ................................................................ 12

    B.   The Injunctive Relief Sought is not Likely to Redress the Alleged Future Harm ........... 15

    C.   LMU Fails to State an Antitrust Claim upon which Injunctive Relief Can be Granted ... 16

       i.   LMU Lacks Antitrust Standing ...................................................... 16

       ii.   LMU Fails to State a Plausible Sherman Act § 1 Claim ................... 19

          a.   LMU has not Plausibly Alleged an Agreement ......................... 19

          b.   LMU has not Plausibly Alleged that the AVMA has Unreasonably Restrained Trade in the Relevant Markets under the Governing Rule of Reason ................................ 21

       iii.   LMU Fails to State a Plausible Sherman Act § 2 Claim .................. 24

    D.   LMU Fails to State a Due Process Claim ............................................. 26

V. CONCLUSION ...................................................................................................... 29

# I. INTRODUCTION

In this litigation, Lincoln Memorial University ("LMU") asks this Court to effectively require the continued accreditation of its college of veterinary medicine in Tennessee ("LMU-TN"), which is currently accredited, is free to accept new students, and is able to graduate students from an accredited institution, but has been placed on probationary status in order to give it time to correct certain deficiencies in its program identified after careful review by the Council on Education ("COE") of the American Veterinary Medical Association ("AVMA"). LMU further asks this Court to effectively mandate the "reasonable assurance" of the college of veterinary medicine that LMU is developing in Florida ("LMU-FL"), simply because LMU fears that program might somehow be denied accreditation in the future.

Beyond those two campuses, LMU is asking this Court to declare unlawful a standard for accreditation that has long been in effect, that was adopted by the COE in order to assure an appropriate education for veterinary students, and that, most significantly, has been reviewed by the United States Department of Education ("USDE"). LMU is also asking this Court to sever the COE from the AVMA, even though that relationship has been reviewed by the USDE; even though the COE operates independently of the AVMA; and even though this Court has recognized that "great deference" should be afforded to the decisions of accrediting bodies in LMU's similar challenge to the accreditation procedures of the American Bar Association. *See Lincoln Mem'l Univ. Duncan Sch. of Law v. Am. Bar Ass'n*, No. 3:11-cv-00608, 2012 WL 137851, at *9 (E.D. Tenn. Jan. 18, 2012) (Varlan, J.), *reconsideration denied*, 2012 WL 1108125 (E.D. Tenn. Apr. 2, 2012). In these circumstances, the following conclusions are inescapable:

    1.    LMU's claims are not ripe for adjudication. The claims will only be ripe for judicial review if LMU-TN is placed on terminal accreditation or if LMU-FL is denied a

letter of reasonable assurance; the affected program invokes the appeals procedures available; *and* the affected program is unsuccessful on appeal. None of that has yet occurred, assuming it ever will.

2.      If LMU has objections to either the standards of the COE or to the relationship between the COE and the AVMA, those objections should be addressed, not to this Court, but to the USDE, the body responsible for recognizing accreditation organizations in the United States. Notably, the USDE has recently reviewed the standards of the COE and the relationship between the COE and the AVMA, finding no fault with either.

But even apart from these procedural conclusions, LMU's antitrust claims cannot survive a motion to dismiss for at least three reasons. First, review of accreditation decisions is deferential to the accreditation organization. The accreditation standards of the COE are afforded great deference, and the Court is not free to substitute its own judgment for that of the COE. *Thomas M. Cooley Law School v. Am. Bar Ass'n*, 459 F.3d 705, 713 (6th Cir. 2006). If there is any reasonable basis for the action of the accreditation organization, that action must be upheld. LMU's preference for different accreditation standards does not state a cause of action under the antitrust laws.

Second, the antitrust laws prohibit harm to competition, not harm to an individual competitor. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990). The Sixth Circuit accordingly has not found a single case in which a denial of school accreditation gave rise to a successful claim of an antitrust violation. *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001). All LMU is alleging is harm to itself as an individual competitor; LMU ignores its own allegation that there are over 30 other veterinary schools in this country competing with one another for students. Thus, even if LMU's programs

were to be denied accreditation (which has not occurred), competition among veterinary medical schools would remain vigorous and unsuppressed.

Third, if it were to occur in the future, a denial of accreditation would not be the proximate cause of any antitrust injury to LMU. LMU would still be free to operate its schools as it sees fit, albeit without accreditation by the COE. The extent to which accreditation bears on the ability of LMU's graduates to obtain licensure in particular states is determined by state legislatures. Any injury to LMU stemming from loss of accreditation (if any) would therefore be caused by state laws that require graduation from an accredited veterinary program as a precondition to licensure. Whatever power COE has in the accreditation of veterinary schools is the result of recognition from the USDE and acceptance of its accreditation decisions by state legislatures, not by any unlawful action by the AVMA. For these reasons, and others, LMU fails to plausibly allege any Sherman Act claim under the standard set forth in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), and its progeny.

Likewise, LMU's due process claims do not state a plausible cause of action. LMU is required to exhaust the COE's appeals process before pursuing any due process claim, as this Court found in LMU's similar challenge to the American Bar Association's accreditation standards. *Lincoln Mem'l*, 2012 WL 137851, at *9. LMU has not exhausted those procedures, and indeed has not even had to, because it has not suffered any adverse accreditation decision. At present, LMU has merely been advised of certain deficiencies in its programs, and provided detailed reasons why the COE regards those deficiencies as inconsistent with its standards for accreditation. The COE's detailed findings as to LMU's deficiencies are afforded great deference, and because they are not arbitrary and unreasonable or an abuse of discretion, this Court is not free to substitute its judgment for that of the COE. *Cooley*, 459 F.3d at 713.

All that has yet occurred is that LMU-TN has been placed on temporary, probationary accreditation status for two years—with the possibility of extension—while it is being given time to cure the deficiencies identified. During the probationary period, the school continues to be accredited. If the identified deficiencies have not been corrected by the end of the probationary period, LMU will be entitled to full due process, including the opportunity to set forth its position in writing and to have a hearing, before accreditation is denied.

LMU-FL's position is even more tenuous, as it has only received a report of evaluation, and remains eligible for a letter of reasonable assurance. Should the COE ultimately find that the LMU-FL does not meet the accreditation standards sufficient to receive reasonable assurance, LMU-FL will, as noted above, be given full due process. LMU simply fears that LMU-FL may, at some time in the future, be denied accreditation, but that speculative fear cannot support a claim of violation of due process.

When all is said and done, LMU is advocating for a drastic and untenable remedy, up to and including the complete separation of the COE from the AVMA. This remedy is merely a lever to try to force the COE to accredit LMU's veterinary programs, even though there is absolutely no merit to LMU's claims of violations of the antitrust laws or of due process. For the reasons set forth in the remainder of this brief, LMU's Complaint should be dismissed with prejudice.

## II. FACTUAL ALLEGATIONS AND CLAIMS ASSERTED

### A. The AVMA and the COE

The AVMA is a national professional association with approximately 108,000 members. In 1946, the AVMA formed the COE. *See* ACCREDITATION POLICIES AND PROCEDURES OF THE AVMA

4

COUNCIL ON EDUCATION (hereinafter COE POLICIES) § 1.2.1. (AVMA, July 2025).[1] Pursuant to the Higher Education Act ("HEA"), the USDE recognizes the COE as the accrediting body for programs conferring professional degrees in veterinary medicine, including the doctor of veterinary medicine ("DVM") degree.[2] Compl. ¶¶ 45-46 (citing 20 U.S.C. § 1099b); COE POLICIES § 1.6.1.

To ensure compliance with USDE guidelines, "[t]he COE demonstrates that accreditation decisions are independent of, and not influenced by the AVMA or its recognized affiliate organizations, or any other entity." COE POLICIES § 1.6.1; *see also id.* § 1.2.4 ("It is the policy of the COE that its accreditation decisions are independent and not subject to interference from any organization or individual."). Of the twenty members of the COE, three are members of the public, and the remaining seventeen are chosen by bodies separate and apart from the AVMA's board or chief executive officer. *Id.* §§ 1.3.1 & 4.1.2, App. B. Exercising the authority recognized by the USDE, the COE has crafted a uniform accreditation process aimed at "protecting the rights of the students, assisting the colleges to improve veterinary medical education, and assuring the public that accredited programs provide a quality education." *Id.* § 1.2.2.

**B.      The DVM Accreditation Process**

The COE promulgates eleven Standards of Accreditation (the "Standards) that veterinary colleges must satisfy to receive and maintain accreditation. Compl. ¶¶ 154-55; COE POLICIES § 2.1.1. LMU takes particular issue with Standard 10 (Research Programs). Compl. ¶ 156. That

---

[1] A true and correct copy of the COE POLICIES, quoted and referenced throughout the Complaint, is attached to Defendant's Motion to Dismiss as **Exhibit "A"**. *See infra* § III (at this stage, the Court may consider documents referenced or quoted in the Complaint, as well as public records).

[2] "The federal government does not directly accredit institutions of higher education. Rather, the Secretary of Education approves accrediting agencies for different types of educational programs, and these accrediting bodies set independent standards for accreditation." *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 707 (6th Cir. 2006).

Standard provides:

> The college must foster and support an environment and culture of scientific inquiry. The college must maintain substantial research activities of high quality that integrate with and strengthen the professional program, such as basic science, clinical science, or scholarship in teaching and learning. Continuing scholarly productivity within the college must be demonstrated and the college must provide access to opportunities for any interested students in the professional veterinary program to be exposed to or participate in on-going high-quality research. All students must receive training in the principles, application, and ethics of research methods and in the appraisal and integration of research into veterinary medicine and animal health.

*Id.* (emphasis omitted) (quoting COE POLICIES § 2.1.1). Standard 10 therefore "serves to ensure student exposure to performance of high-quality research and ability to acquire, evaluate, and use new knowledge." *Id.* ¶ 157 (quoting COE POLICIES § 4.2.5, App. I); *see also* COE POLICIES § 4.2.1, App. E.

When a new or developing college applies for accreditation, the COE will review the application and a site visit team will conduct a "consultative" site visit. Compl. ¶ 159 (citing COE POLICIES § 3.1.1). Site visits involve a thorough review of the college's proposed program, including consultations with college administration and faculty, and tours of facilities. COE POLICIES § 2.3.1. The COE will then furnish a detailed report to the college, identifying any deficiencies the college may have in satisfying the Standards. Compl. ¶ 159 (citing COE POLICIES § 3.1.1). Once the college corrects any identified deficiencies, it may request a "comprehensive" site visit. *See id.*; COE POLICIES § 3.2.1.

After considering the site team's report of evaluation, and assuming the new or developing college satisfies the Standards, the COE will then issue a letter of reasonable assurance. COE POLICIES § 3.1.1; *see also* Compl. ¶¶ 159-60. The letter of reasonable assurance does not accredit the new or developing college, but allows the college "to pursue its plan for the veterinary program, and to admit students." Compl. ¶ 160 (quoting COE POLICIES § 3.1.1). Once the new or developing

college has admitted its first class, it may be awarded provisional accreditation. *Id.*

During the second half of the final year of the first matriculated class, a site team will conduct a comprehensive visit to determine the college's compliance with each Standard. COE POLICIES § 3.2.2. If the COE determines that the college's program complies with each standard, the college will be placed on accredited status. *Id.*; *see also* Compl. ¶ 160. To maintain accreditation, colleges must "provide an extensive self-evaluation and arrange for a site visit at intervals of not more than seven years." COE POLICIES § 3.2.4. If a college is found to have one or more minor deficiencies in satisfying the Standards, its classification will be changed to "accredited with minor deficiency(ies)." *Id.* § 3.2.5. If a college is found to have one or more major deficiencies, its classification will be changed to "probationary accreditation." *Id.* § 3.2.6. Schools placed on probationary accreditation are provided two years to cure the major deficiencies identified. *Id.* If the college does so, it will be returned to accredited status; if the college does not, the COE will either continue the probationary accreditation period for good cause, or assign the college the "terminal accreditation" classification following due process procedures. *Id.*

Terminal accreditation is considered an "adverse accreditation decision," along with "withholding initial or renewed accreditation, administrative withdrawal of accreditation, [and] denial of a reasonable assurance." Compl. ¶ 162 (quoting COE POLICIES § 2.5.1). When the COE identifies major deficiencies that may result in an adverse accreditation decision, the COE defers its decision, provides written notice to the college of each deficiency and recommendation, and provides the college with an opportunity to respond in writing. COE POLICIES § 2.5.1. When an adverse accreditation decision occurs, the affected college has the right to appeal prior to a final decision. *Id.* § 2.5.4; *see also* Compl. ¶ 161. If an appeal is filed, a hearing panel consisting of former COE members, and including at least one public member, will hold a hearing, during which

7

the college has "the right to present witnesses and submit documents and other written materials," and "may be represented by legal counsel," in accordance with federal law. COE POLICIES § 2.5.4; *see also* 20 U.S.C. § 1099b(a)(6)(D); 34 C.F.R. § 602.25(f)(2). Only *after* the appeals processes have been completed and the decision has been confirmed will the decision of the COE be considered final. COE POLICIES § 2.5.4.

## C. LMU's Accreditation Status

LMU is a private university located in Harrogate, Tennessee. Compl. ¶ 32. LMU's Tennessee campus ("LMU-TN") houses the Richard A. Gillespie College of Veterinary Medicine, which offers an accredited DVM program. *Id.* ¶¶ 115, 120, 153. In 2019, LMU-TN submitted a "substantive change" request to the COE, indicating that it planned to nearly double its class size from 125 students to 225 students through the addition of a second annual matriculating cohort. *See id.* ¶ 168. Approval of substantive change requests are within the discretion of the COE, and a "site visit may be required to verify that the reported substantive changes do not negatively impact the college's compliance with any or all of the Standards." COE POLICIES § 3.4.1. By letter dated October 14, 2022,[3] the COE approved LMU-TN's substantive change request, but also noted that a site visit would be required to ascertain whether the substantial increase in class size might raise issues of compliance with the Standards. *See* Compl. ¶ 171; Ex. B. The letter further directed LMU-TN to report on specific issues, including faculty and student exposure to and engagement in research opportunities. Ex. B.

In February, 2024, in accordance with COE procedures and the October 14, 2022 letter, a site team conducted a focused site visit to evaluate the impact of the substantial increase in class size on LMU-TN's continued compliance with the Standards. Compl. ¶ 185; Ex. B. The stated

---

[3] A true and correct copy of October 14, 2022 letter, quoted and referenced throughout the Complaint, is attached to Defendant's Motion to Dismiss as **Exhibit "B"**. *See infra* § III.

goals of the site visit included evaluating student exposure to and engagement in research opportunities. Ex. B. The October 14, 2022 letter did *not* inform LMU-TN that the dramatic increase in class sizes would not require "any adjustments to LMU-TN's research offerings," as LMU alleges. *Compare* Compl. ¶ 173, *with* Ex. B. Instead, the October 14, 2022 letter provides that subsequent reporting and site visits were required to review these very issues. Ex. B.

On October 24, 2024, the COE submitted a detailed, 64-page Report of Evaluation (the "LMU-TN Report of Evaluation),[4] placing LMU-TN on probationary accreditation for a "major deficiency" in Standard 10 (Research Programs), and noting a "minor deficiency" in Standard 7 (Admissions). Ex. C; *see also* Compl. ¶ 186. LMU-TN was given two (2) years to cure these deficiencies, specifically until October 24, 2026. Compl. ¶ 198; *accord* COE POLICIES § 3.2.6. If LMU-TN does not cure the deficiencies in that time period, the COE may extend the probationary period an additional year, until October 24, 2027. *See* COE POLICIES § 3.2.6; Ex. C.

LMU plans to open a second college of veterinary medicine—LMU-FL—in 2026. Compl. ¶ 203. In accordance with the procedures for new or developing colleges, a site team conducted a consultative site visit at the LMU-FL campus in November, 2023, and a comprehensive site visit in January, 2025. *Id.* ¶ 204; *accord* COE POLICIES § 3.2.1. Following the latter visit, the COE provided LMU-FL a detailed, 72-page "Report of Evaluation for a Comprehensive Visit for a Letter of Reasonable Assurance" (the "LMU-FL Report of Evaluation").[5] Compl. ¶ 206.

The LMU-FL Report of Evaluation provides a thorough assessment of LMU-FL's current and planned facilities, curriculum, and faculty, which, unless improved, would not comply with

---

[4] A true and correct copy of the LMU-TN Report of Evaluation, quoted and referenced throughout the Complaint, is attached to Defendant's Motion to Dismiss as **Exhibit "C"**. *See infra* § III.

[5] A true and correct copy of the LMU-FL Report of Evaluation, quoted and referenced throughout the Complaint, is attached to Defendant's Motion to Dismiss as **Exhibit "D"**. *See infra* § III.

Standard 3 (Physical Facilities and Equipment), Standard 6 (Students), Standard 8 (Faculty), Standard 9 (Curriculum), and Standard 10 (Research Programs). Ex. D; *see also* Compl. ¶ 207. LMU-FL was given the opportunity to provide written responses to the LMU-FL Report of Evaluation. Ex. D; *see also* COE POLICIES § 2.5.1. LMU-FL has done so, and the Complaint does not allege that the COE has yet made a final determination as to whether LMU-FL will be provided a letter of reasonable assurance.

## D. Claims Asserted and Relief Requested

LMU initiated this action on June 18, 2025. In Counts I and II, LMU alleges that the AVMA, its members and officers, and the COE have unlawfully conspired to unreasonably restrain trade in the markets for "veterinary services" and "veterinary education." Compl. ¶¶ 224-260. In Count III, LMU alleges that the AVMA has unlawfully exercised monopoly power in the market for "veterinary accreditation." *Id.* ¶¶ 261-270. In Count IV, LMU alleges that the COE's assessment of LMU's compliance with the Standards constitutes an abridgment of due process. *Id.* ¶¶ 271-81.

For these supposed harms, LMU seeks two broad categories of injunctive relief. In the first category, LMU seeks to enjoin the COE from assessing LMU's compliance with the Standards in an "arbitrary, capricious, and inconsistent manner," or "in a manner more restrictive than necessary." *Id.*, at p. 64 ¶¶ (a), (c). In the second category, LMU seeks an order mandating a "total and complete separation" of the COE from the AVMA, and the judicial creation of a new accrediting body. *Id.*, at p. 64 ¶ (b). As detailed *infra*, the antitrust claims and the due process claim do not present a justiciable case or controversy, or plausibly state a claim upon which this Court can grant the wide-ranging injunctive relief sought.

### III. MOTION STANDARDS

**A.      Lack of Subject-Matter Jurisdiction under Rule 12(b)(1)**

Article III of the Constitution confines the jurisdiction of federal courts to "cases" and "controversies." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). "[I]f a dispute is not a proper case or controversy, the courts have no business deciding it." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). Two related doctrines of justiciability—ripeness and standing—inform the Article III "case or controversy" requirement. *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). For a court to exercise jurisdiction, a case must be ripe for adjudication and the plaintiff must possess standing. *Trump*, 592 U.S. at 131; *United States v. Storer Broad. Co.*, 351 U.S. 192, 197 (1956) ("Jurisdiction depends upon standing to seek review and upon ripeness.").

A defendant challenging subject-matter jurisdiction on these grounds may do so through either a "facial" or "factual" attack. *See Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015). When confronted with a facial attack, as here, the Court accepts the well-plead allegations of the complaint as true, mirroring the approach used to review motions to dismiss under Rule 12(b)(6). *Id.* Ultimately, however, "[t]he party invoking federal jurisdiction has the burden to prove that jurisdiction." *Id.*; *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside [a federal court's] jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.") (Internal citations omitted).

**B.      Failure to State a Claim under Rule 12(b)(6)**

To survive dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,

11

556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plaintiff is therefore required to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Instead, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

In analyzing a motion to dismiss under Rule 12(b)(6), the Court is generally confined to the well-plead allegations of the complaint. *Watermark Senior Living Ret. Cmtys., Inc. v. Morrison Mgmt. Specialists, Inc.*, 905 F.3d 421, 425 (6th Cir. 2018). While the Court accepts those allegations as true, it "need not accept as true legal conclusions or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 276 (6th Cir. 2010); *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986) (courts are "not bound to accept as true a legal conclusion couched as a factual allegation"). And if, as here, "a plaintiff references or quotes certain documents, or if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion." *Watermark*, 905 F.3d at 425 (quoting *In re Omnicare, Inc. Secs. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014)).

## IV. ARGUMENT

### A.     LMU's Claims are Not Ripe

The ripeness doctrine is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003). It follows that "[f]ederal courts lack subject-matter jurisdiction over claims that are not yet ripe." *Doe v. Univ. of Mich.*, 78 F.4th 929, 950 (6th Cir.

2023); *see also Trump*, 592 U.S. at 131. To determine ripeness, the Court must evaluate "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Geomatrix, LLC v. NSF Int'l*, 82 F.4th 466, 476 (6th Cir. 2023) (quoting *Nat'l Park*, 538 U.S. at 808). A claim is ultimately unripe, however, if it is dependent upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump*, 592 U.S. at 131 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

LMU's due process and antitrust claims are all dependent upon a contingent future event—namely, a final decision denying accreditation after LMU has exhausted its ability to appeal. At present, LMU-TN remains accredited and LMU-FL remains eligible for a letter of reasonable assurance. *See, e.g.,* Compl. ¶ 153 (noting LMU-TN is an accredited DVM program). A final decision denying accreditation would only occur if LMU-TN or LMU-FL does not cure the identified deficiencies in the time frames provided, suffers an adverse accreditation decision, *and* is unsuccessful on appeal of that adverse accreditation decision. *See* COE POLICIES § 2.5.4. Only if this hypothetical chain of events occurs will LMU's claims ripen. Accordingly, it is "too speculative whether the problem [LMU] presents will ever need solving," such that "this matter is not ripe for adjudication." *Texas*, 523 U.S. at 302.

For this same reason, LMU has not alleged that it will suffer a future injury in fact that is "concrete and particularized" and "actual or imminent," sufficient to confer Article III standing. *See All. for Hippocratic Med.*, 602 U.S. at 381; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Because LMU seeks only forward-looking, injunctive relief, it must allege "a real and immediate threat of repeated injury." *Murthy*, 603 U.S. at 58. The "threat" LMU identifies is an eventual final decision denying accreditation. *See, e.g.,* Compl. ¶¶ 199, 222. But that is merely an allegation of "*possible* future injury," which is not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409

(2013) (emphasis in original); *see also All. for Hippocratic Med.*, 602 U.S. at 381 ("[T]he injury must be actual or imminent, not speculative."). Instead, the "threatened injury must be *certainly impending* to constitute injury in fact." *Clapper*, 568 U.S. at 409 (emphasis in original); *accord Lujan*, 504 U.S. at 564 n.2; *see also Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 399 (6th Cir. 2001) ("Ripeness requires that the injury in fact be certainly impending.") (Markings omitted).

The speculative possibility that LMU-TN or LMU-FL will suffer an adverse accreditation decision and then be unsuccessful in an appeal of that decision at some indeterminate point in the future is not "certainly impending." Accepting the Complaint's allegations as true, the COE has provided LMU-TN and LMU-FL substantial periods of time to cure the deficiencies identified. *See* Compl. ¶ 198; Exs. C, D. If LMU so cures, it will presumably avoid any adverse accreditation decision and thereby eliminate the certainty of the threatened injury. And because LMU "cannot manufacture standing merely by inflicting harm on [itself] based on [its] fears of hypothetical future harm that is not certainly impending," *Murthy*, 603 U.S. at 73, it cannot premise standing based on any implication that it will simply decline to cure such deficiencies. LMU is therefore caught between the Scylla of avoidable injury and the Charybdis of self-inflicted harm, both of which preclude any Article III case or controversy.

Moreover, LMU will not suffer any substantial hardship warranting premature judicial review of speculative harms. "[T]he disadvantages of a premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of—even repetitive—postimplementation litigation," *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 735 (1998), and this case is no exception. Even if LMU-TN or LMU-FL suffers an adverse accreditation decision in the future, it is not without recourse before the occurrence of a final decision denying

accreditation. The aggrieved college can—and indeed must, *see infra* § IV(D)—appeal the decision. *See* COE POLICIES § 2.5.4. And to the extent LMU complains of the generalized possibility of losing accreditation, such a prospect is not a unique or specialized hardship. *Cf. All. for Hippocratic Med.*, 602 U.S. at 381 (injury in fact cannot be a "generalized grievance"). Every DVM program in the United States is *always* under the possibility that it will one day be denied accreditation. This omnipresent, hypothetical possibility does not present any substantial hardship warranting judicial review of LMU's premature and unripe claims.

Thus, "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump*, 592 U.S. at 131. This Court must resist LMU's request to entangle itself in an unripe controversy dependent upon speculative future events that could theoretically occur to any DVM program in the country.

## B.     The Injunctive Relief Sought is not Likely to Redress the Alleged Future Harm

LMU must "clearly allege facts demonstrating each element" of Article III standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (ellipses omitted). These include, in addition to the injury in fact requirement discussed above, the requirement that the injury will likely be redressed by the requested judicial relief. *See All. for Hippocratic Med.*, 602 U.S. at 380; *Lujan*, 504 U.S. at 560-61. This redressability element requires the Court to "consider the relationship between the judicial relief requested and the injury suffered." *Murthy*, 603 U.S. at 73 (markings omitted) (quoting *California v. Texas*, 593 U.S. 659, 671 (2021)).

The judicial relief requested here is unrelated to the threatened injury LMU fears. Although LMU's alleged future injury concerns a final decision denying accreditation that it may or may not ever experience, LMU seeks wide-ranging injunctive relief preventing the COE from generally applying its Standards in an improper manner, and ordering the total and complete divestiture of

the COE from the AVMA, with the construction of a new accrediting body by judicial decree. Compl., at p. 64, ¶¶ (a)-(c). But Article III only "grants federal courts the power to redress harms that *defendants cause plaintiffs*." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021) (emphasis supplied); *see also All. for Hippocratic Med.*, 602 U.S. at 400 (Thomas, J., concurring) ("For a plaintiff to have standing, a court must be able to provide a remedy that can redress *the plaintiff's* injury.") (Emphasis in original) (markings omitted). The sweeping injunctive relief requested here is not tailored to redress LMU's specific threatened injury,[6] and is instead sought to implement LMU's policy preferences by judicial fiat.

In sum, LMU has not established a certainly impending future injury in fact, nor prayed for injunctive relief that will actually redress that speculative injury. As this Court is not a "vehicle for the vindication of the value interests of concerned bystanders," *All. for Hippocratic Med.*, 602 U.S. at 382, no Article III case or controversy exists to adjudicate.

**C.     LMU Fails to State an Antitrust Claim upon which Injunctive Relief Can be Granted**

Because LMU's claims are not justiciable, it follows that LMU cannot obtain any relief. That said, should the Court reach the merits of each cause of action asserted, each claim fails as a matter of law as well.

**i.     LMU Lacks Antitrust Standing**

"[A]ntitrust standing is a threshold, pleading-stage inquiry," and, when absent, requires dismissal of a complaint under Rule 12(b)(6). *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 448-49 (6th Cir. 2007) (en banc). To demonstrate antitrust standing, a plaintiff seeking injunctive relief must allege an "antitrust injury," *i.e.*, a threatened loss or damage "of the type the antitrust laws were

_____

[6] Common sense compels this conclusion. Even if the Court were to grant the relief requested, a newly created accrediting body could come to the same conclusion that LMU does not comply with accreditation standards.

designed to prevent and that flows from that which makes defendant['s] acts unlawful." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986), *extending*, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977). It is well-established that the antitrust laws were designed for "the protection of *competition*, not *competitors*." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (emphasis in original). To prove antitrust injury, therefore, "the key inquiry is whether competition—not necessarily a competitor—suffered as a result of the challenged business practice." *Wee Care Child Ctr., Inc. v. Lumpkin*, 680 F.3d 841, 847 (6th Cir. 2012).

As discussed *supra*, the threatened injury here is the speculative future denial of LMU's accreditation. *See, e.g.,* Compl. ¶¶ 199, 222. The Sixth Circuit has rejected the notion that the mere loss of accreditation constitutes an antitrust injury. *See Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531-32 (6th Cir. 2001) ("We have not found a case, however, in which a denial of school accreditation gave rise to a successful allegation of antitrust injury."). Even if denial of school accreditation may "result[] in a loss of reputation or a drop in school enrollment," as alleged here, Compl. ¶ 197, such threatened harms do not "constitute antitrust injuries." *Id.* at 531 (citing *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1038 (3d Cir. 1997) ("A loss of prestige resulting from a refusal to approve a product or service does not alone make out an antitrust claim."); *see also K & S Assocs., Inc. v. Am. Ass'n of Physicists in Med.*, No. 3:09-1108, 2013 WL 2177938, at *18 (M.D. Tenn. May 20, 2013) (that plaintiff may "suffer economic consequences" upon losing its accreditation does not constitute antitrust injury); *Am. Bd. of Opticianry & Nat'l Contact Lens Exam'rs, Inc. v. Inst. for Credentialing Excellence*, No. 1:15-cv-1169-GBL-TCB, 2016 WL 11668712, at *7 (E.D. Va. Mar. 4, 2016) (plaintiff failed to allege anticompetitive effects arising from defendant's rejection of accreditation application sufficient to plead antitrust injury).

The application of antitrust standing (or lack thereof) to loss of accreditation reflects the overarching consideration that a harm or loss is "no moment to the antitrust laws if competition is not injured." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993); *see also K & S Assocs.*, 2013 WL 2177938, at *18 (suggesting loss of plaintiff's accreditation is harm only "to plaintiff as a competitor and not to marketplace competition"). The antitrust laws are of "no moment" here, because LMU only alleges injury to itself.[7] *See* Compl. ¶ 153 (noting there are over thirty other accredited schools besides LMU). LMU's allegations of harm to competition generally rely on conclusory assertions, which are insufficient. *See, e.g.,* Compl. ¶ 233, 249 (averring conclusion that AVMA "restrains and injures competition"); *see also Papasan*, 478 U.S. at 286 (courts are "not bound to accept as true a legal conclusion couched as a factual allegation"). A complaint, as here, "alleging only adverse effects suffered by an individual competitor cannot establish an antitrust injury." *Wee Care*, 680 F.3d at 848.

Moreover, even if the threatened loss of accreditation here could be considered harm to competition generally, it "will not qualify as [an] antitrust injury unless it is attributable to an anticompetitive aspect of the practice under scrutiny." *NicSand*, 507 F.3d at 451 (markings omitted) (quoting *Atl. Richfield*, 495 U.S. at 334). At their core, the antitrust claims posit that LMU has engaged in an unlawful form of "economic protectionism" to suppress the supply of veterinarians in the United States. Compl. ¶ 112. But as detailed below in Section IV(B)(ii)(b), any such suppression is not attributable to the COE's accreditation decisions—"the practice under scrutiny"—it is instead attributable to state law. State legislatures, as opposed to the AVMA,

---

[7] To the extent LMU suggests that competition is generally harmed because other schools may be denied accreditation, that too fails. *See* Compl. ¶ 110 (noting that as of October, 2024, there are thirteen proposed new veterinary colleges; but not alleging that any of those colleges have been denied accreditation). LMU has not brought a class action, and even if it did, LMU cannot predicate standing on hypothetical future injuries to unnamed class members. *See Blum v. Yaretsky*, 457 U.S. 991, 999 (1982).

control the licensure of veterinarians. *See* Compl. ¶ 54; TENN. CODE. ANN. § 63-12-112. Any ostensible harm to competition is therefore attributable to the alleged anticompetitive effects of state law, not the effects of COE accreditation standards.

Accordingly, because the only threatened harm or loss alleged is a conjectural future decision denying LMU accreditation, the Complaint fails to allege an injury of the type the antitrust laws were designed to prevent attributable to any anticompetitive conduct by the AVMA.

### ii. LMU Fails to State a Plausible Sherman Act § 1 Claim

Putting aside LMU's lack of antitrust standing, the allegations fail to state any claim for injunctive relief under the specific provisions of the Sherman Act cited. LMU first invokes Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. It is well-established, however, that this prohibition applies only to "*unreasonable* restraints" on trade. *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (emphasis in original). To state a claim under Section 1, therefore, LMU must plausibly allege a contract, combination, or conspiracy that imposes an unreasonable restraint on trade. *See Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 663 (6th Cir. 2022). LMU has not plausibly alleged an agreement or an unreasonable restraint in any relevant markets sufficient to state such a claim here.

### a. LMU has not Plausibly Alleged an Agreement

The standard for pleading an unlawful agreement to restrain trade is clearly set forth in *Twombly*. That decision makes clear that "allegations of parallel conduct and bare assertions of conspiracy no longer supply an adequate foundation to support a plausible [Section] 1 claim." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902-03 (6th Cir. 2009) (citing *Twombly*, 550 U.S. at 556). Instead, LMU must plead "enough factual matter (taken as true) to suggest that

an agreement was made." *Twombly*, 550 U.S. at 556. To that end, "[a]n agreement to conspire can be alleged through either direct or circumstantial evidence." *In re Passenger Vehicle Replacement Tires Antitrust Litig.* (MDL No. 3107), 767 F. Supp. 3d 681, 712 (N.D. Ohio 2025); *accord Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014).

LMU suggests a vague conspiracy between the AVMA, its members and officers,[8] and the COE, to implement the COE's accreditation process in a manner that restricts the supply of veterinarians and veterinary schools. *See, e.g.,* Compl. ¶¶ 234, 249. LMU alleges no direct evidence, "tantamount to an acknowledgment of guilt," *Hyland*, 771 F.3d at 318, of such conspiracy. *See also In re Passenger Vehicle*, 767 F. Supp. 3d at 696 ("Direct evidence of antitrust conspiracies is rare, and the element of agreement is nearly always established by circumstantial evidence.") (Citation modified). LMU instead relies entirely on circumstantial evidence. LMU proffers out-of-context language from statements and studies to contrive some ill-motive to suppress the supply of veterinarians in the United States. Compl. ¶¶ 109-11. But in so doing, LMU pleads exactly what "will not suffice," namely: "a bare assertion of conspiracy." *Twombly*, 550 U.S. at 556.

The cherry-picked language from the statements of some AVMA leaders and studies merely discuss future projections in the supply of and demand for veterinarians—they do not, as required, "raise[] a suggestion of a preceding agreement." *Id.* at 557; *cf. Brooke Grp.*, 509 U.S. at 225 ("Even an act of pure malice by one business competitor against another does not, without more, state a

---

[8] "A trade association is not by its nature a 'walking conspiracy.'" *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293-94 (5th Cir. 1988). Therefore, the mere participation of members in the AVMA does not itself suggest any agreement or conspiracy. *See Hobart-Mayfield*, 48 F.4th at 667-68 (declining to consider mere "shared membership in trade associations" as suggestive of conspiracy); *In re Passenger Vehicle*, 767 F. Supp. 3d at 711-12 (finding "mere attendance at [] trade association meetings contributes little, if anything, to the plausibility of the alleged conspiracy").

claim under the federal antitrust laws."). Any suggestion of agreement that can be derived therefrom (if any) is belied by the professed separation and independence of the COE from the AVMA. *See* COE POLICIES §§ 1.2.4, 1.6.1. Unrelated statements and studies by the AVMA—and not the COE—do not plausibly suggest that the AVMA and COE have dispensed with that separation and independence.

Consequently, the bare-bones allegations of collusion and rote recitation of irrelevant statements by the AVMA do not "allow[] the court to draw the reasonable inference," *Iqbal*, 556 U.S. at 678, that any unlawful has been reached between the AVMA, its members and officers, and the COE.

> **b.** **LMU has not Plausibly Alleged that the AVMA has Unreasonably Restrained Trade in the Relevant Markets under the Governing Rule of Reason**

Beyond the failure to allege an agreement, LMU fails to plausibly allege that the AVMA unreasonably restrained trade in any relevant market. Whether a restraint is unreasonable is determined under either the "*per se* rule" or the "rule of reason." *Am. Express*, 585 U.S. at 540-41. "The *per se* standard is reserved for conduct that is so obviously anticompetitive that it has no plausibly procompetitive features." *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)* (MDL No. 3071), 709 F. Supp. 3d 478, 519 (M.D. Tenn. 2023) (markings omitted); *see also Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005) ("There is an automatic presumption in favor of the rule of reason standard."). Because "accreditation serves an important public purpose and can enhance competition," the Sixth Circuit has analyzed antitrust claims based on accreditation decisions under the rule of reason. *Interior Design*, 244 F.3d at 530; *see also Mass. Sch. of Law*, 107 F.3d at 1033 (applying rule of reason to antitrust claim against accrediting body); *K & S Assocs.*, 2013 WL 2177938, at *14 ("[A]utomatic presumption in favor

of the rule of reason … is applicable here given the [defendant's] role as the accrediting body."). Under the rule of reason, LMU must allege "anti-competitive effects within relevant product and geographic markets." *Interior Design*, 244 F.3d at 531.

The Complaint alleges two relevant markets: (1) a nationwide "veterinary education market," encompassing the "teaching facilities and services used to train veterinarians;" and (2) a nationwide "veterinary services" market, encompassing the "provision of professional veterinary care and services."[9] Compl. ¶¶ 69, 75. As a threshold matter, LMU carries an initial burden of proving that "the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market[s]." *Am. Express*, 585 U.S. at 541. LMU attempts to do by baldly asserting that the supposed conspiracy between the AVMA and COE reduces the output of veterinarians, and in turn, increases the prices paid by consumers of veterinary medicine. *See, e.g.*, Compl. ¶ 234. But LMU has not presented direct or indirect evidence of any substantial anticompetitive effects in the relevant markets, as required. *See Am. Express*, 585 U.S. at 541-42.

Direct evidence requires "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* at 542 (internal markings and citations omitted). LMU has not proffered any factual allegations demonstrating any quantifiable decrease in the supply of veterinarians, or quantifiable increase in consumer costs for veterinary medicine. LMU is therefore required to present indirect evidence of substantial anticompetitive effects, which requires "proof of market power plus some evidence that the challenged restraint harms competition." *Id*. Market power is the "ability to raise price profitably *by restricting output*." *Id.* at 549 (emphasis in original); *see also* Compl. ¶ 72 (quoting same). Neither the AVMA nor the COE possesses such power. The COE merely accredits

---

[9] LMU concedes that it is not even a competitor in the "veterinary services" market. Compl. ¶ 80.

veterinary colleges—it does not have any ability to restrict the number of veterinary colleges or the number of graduates from such colleges, accredited or otherwise.

The extent to which accreditation determines whether graduates of a particular college are eligible to become licensed veterinarians is instead a product of state law. *See* Compl. ¶ 54 (alleging that "[a]ll 50 states require a DVM to have graduated from an accredited school as a prerequisite to practicing veterinary medicine."); *but see* TENN. CODE. ANN. § 63-12-112 (discussed below). Anticompetitive restraints imposed by state law are not prohibited by the Sherman Act under the Supreme Court's *Parker* doctrine. *See Parker v. Brown*, 317 U.S. 341, 352 (1943). Applying the *Parker* doctrine, courts have denied Section 1 challenges against accrediting bodies based on the inability of graduates from unaccredited schools to obtain certification or licensing. *See, e.g.*, *Mass. Sch. of Law*, 107 F.3d at 1036 ("To the extent that [plaintiff's] alleged injury arises from the inability of its graduates to take the bar examination in most states, the injury is the result of state action and thus is immune from antitrust action under the doctrine of *Parker*."); *Haswood v. Am. Polygraph Ass'n*, No. CV-14-00253-PHX-GMS, 2015 WL 846420, at *3 (D. Ariz. Feb. 26, 2015) ("[T]o the extent that Plaintiffs have been harmed by their inability to obtain a license from a state board to practice in the field of polygraph technologies, such injuries are immune from antitrust action."); *Zavaletta v. Am. Bar Ass'n*, 721 F. Supp. 96, 98 (E.D. Va. 1989). LMU therefore cannot transform its grievances with state laws into an actionable Section 1 claim against the AVMA.

Even putting *Parker* immunity aside, any loss of accreditation would not necessarily prevent LMU's students from obtaining licensure, thereby *increasing* the supply of veterinarians. In LMU's home state of Tennessee, for example, the board of veterinary medical examiners may admit to examination any applicant who is "a graduate of a school or college of veterinary medicine approved by the board." TENN. CODE. ANN. § 63-12-112(b)(1). The board, in turn, may approve

*either* "schools and colleges that are accredited by the [AVMA]," *or* "schools and colleges of veterinary medicine which maintain standards of training and reputability sufficient to admit their graduates to the examinations given by the board." *Id.* § 63-12-111(a)-(b). Thus, even if LMU were to be denied accreditation at some point in the future, that alone would not prevent graduates of LMU from being licensed under Tennessee law. LMU's students, therefore, are not barred from licensure simply because LMU might lose accreditation in the future.

LMU has thus failed to plausibly allege direct or indirect evidence of substantial anticompetitive effects harming consumers stemming from the AVMA's actions. This failure, coupled with LMU's inability to raise an inference of agreement above the speculative level, forecloses LMU's ability to recover on its Section 1 claim.

### iii.      LMU Fails to State a Plausible Sherman Act § 2 Claim

For many of the same reasons discussed above, LMU has failed to state a claim for injunctive relief under Section 2 of the Sherman Act, which prohibits the "monopolization" of trade or commerce. 15 U.S.C. § 2. As with its limitations on actionable "restraints" under Section 1, the Supreme Court has clarified that "[s]imply possessing monopoly power … does not violate [Section] 2." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447-48 (2009); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LP*, 540 U.S. 398, 407 (2004). LMU must instead allege, under the standard set forth in *Twombly*, the (1) possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Verizon Commc'ns*, 540 U.S. at 407 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

It is well-established that "[m]onopoly power is the power to control prices or exclude

competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). But the AVMA does not possess the power to exclude competing accreditation bodies from the relevant market "for the provision of accrediting services." Compl. ¶¶ 81, 264. That power rests exclusively with the USDE, the body responsible for recognizing accrediting bodies under the HEA. *See* 20 U.S.C. § 1099b; Compl. ¶ 46. Practically speaking, the USDE is the only entity with the power to increase the number of bodies providing accrediting services in veterinary education. *Cf. Am. Express*, 585 U.S. at 542-43 (antitrust law generally favors "actual market realities").

Similarly, state legislatures are the only entity with the power to determine the effect accreditation decisions have on the licensure of veterinarians. *See* Compl. ¶ 54; TENN. CODE. ANN. § 63-12-112. The AVMA is not subject to Section 2 liability simply because it is the only accrediting body recognized by the USDE and/or state legislatures. The illogical conclusion to the contrary is without a limiting principle, and would render like accrediting bodies such as the American Bar Association necessarily in violation of the Sherman Act.

And even if LMU could somehow establish AVMA's market power in this market, the strained allegations reliant on out-of-context statements do not plausibly suggest any "willful acquisition or maintenance of that power." *Verizon Commc'ns*, 540 U.S. at 407; *see also Pac. Bell*, 555 U.S. at 447-48 ("Simply possessing monopoly power … does not violate [Section 2.)" If anything, given that the USDE has recognized the COE as an accrediting body since 1952, *see* COE POLICIES § 1.6.1, any monopoly power (assuming any) held by the AVMA would more closely resemble a natural monopoly resulting from "historic accident." *See Verizon Commc'ns*, 540 U.S. at 407.

For all of the reasons stated above—lack of antitrust injury and failure to plausibly suggest an agreement or monopoly power—all of LMU's antitrust claims fail to state a claim for injunctive

relief sufficient to avoid dismissal.

### D.    LMU Fails to State a Due Process Claim

Just as *Twombly* directly addresses LMU's antitrust claims, the Sixth Circuit's *Cooley* decision governs LMU's due process claim. *See* Compl. ¶ 272. There, the Court of Appeals recognized that "quasi-public" professional organizations and accrediting agencies, such as the COE, "have a common law duty to employ fair procedures when making decisions affecting their members." *Thomas M. Cooley Law School v. Am. Bar Ass'n*, 459 F.3d 705, 711 (6th Cir. 2006). That said, recognizing that "the standards of accreditation are not guides for the layman but for professionals in the field of education, great deference should be afforded [to] the substantive rules of these bodies." *Id.* at 713 (internal markings and citations omitted). Pursuant to this "great deference," this Court is "not free to … substitute [its] judgment for that of the [COE]." *Id.* Instead, the Court reviews only whether the decision of the COE is "arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence." *Id.* at 712.

Applying the standard in *Cooley*, this Court previously rejected LMU's attempt to enjoin, *inter alia*, an accreditation decision as to LMU's law school. *See Lincoln Mem'l Univ. Duncan Sch. of Law v. Am. Bar Ass'n*, No. 3:11-cv-00608, 2012 WL 137851 (E.D. Tenn. Jan. 18, 2012) (Varlan, J.), *reconsideration denied*, 2012 WL 1108125 (E.D. Tenn. Apr. 2, 2012). Ruling on a motion for preliminary injunction, the Court found that LMU was not likely to succeed on the merits of its due process claim for two reasons. *Id*. at *6. *First*, the Court found that "it appears that exhaustion [of administrative remedies] is required" under 20 U.S.C. § 1099b, and that LMU "did not exhaust the administrative remedy available to it," including its right to appeal the accreditation decision. *Id.* at *6-9; *see also Darby v. Cisneros*, 509 U.S. 137, 153-54 (1993) (in cases not governed by the Administrative Procedures Act, whether a plaintiff is required to exhaust

administrative remedies is "a matter of judicial discretion"). *Second*, the Court held that LMU had not demonstrated "that the decision to deny provisional approval was arbitrary and unreasonable or an abuse of discretion, nor that it was not based on substantial evidence." *Lincoln Mem'l*, 2012 WL 137851, at *18.

The same analysis, albeit adapted to the Rule 12(b)(6) context, forecloses the due process claim here. LMU must first exhaust administrative remedies, *i.e.*, the COE's appeals process, before bringing a due process claim. *See id.* at *9; *William Loveland Coll. v. Distance Educ. Accreditation Comm'n*, 347 F. Supp. 3d 1, 14 (D.D.C. 2018) ("[E]xhaustion is required before an educational institution challenging an accreditation action brings a common law due process claim to federal court."). LMU does not, and cannot, allege that it has done so, because LMU has not suffered any adverse accreditation decision. For this same reason, LMU has not plausibly alleged deprivation of a property interest protected under the Due Process Clause. *See Fields v. Henry Cnty.*, 701 F.3d 180, 185 (6th Cir. 2012) (elements of procedural due process claim include deprivation of a protected interest). LMU-TN is currently accredited and LMU-FL remains eligible for accreditation. *See, e.g.,* Compl. ¶ 153. Thus, to the extent accredited status can be considered a protected property interest, LMU has not suffered any deprivation thereof—and indeed cannot until there is an adverse accreditation decision and then LMU fulfills the COE appeals process.

LMU has further failed to plausibly allege that any decision by the COE was arbitrary and unreasonable, an abuse of discretion, or not based on substantial evidence. *See Cooley*, 459 F.3d at 712; *Pro. Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161, 171 (4th Cir. 2015) (adopting *Cooley* standard); *Paine Coll. v. So. Ass'n of Colls. & Schs. Comm'n on Colls., Inc.*, 810 F. App'x 852, 857 (11th Cir. 2020) (similar). The relevant decisions here are the COE's decisions to place LMU-TN on probationary accreditation, and to issue the

LMU-FL Report of Evaluation. *See* Compl. ¶¶ 186, 206; Exs. C, D. But in both instances, the COE detailed at length the basis upon which it was assessing LMU's deficiencies, after thorough in-person site visits. *See* Exs. C, D; COE POLICIES § 2.3.1. While LMU self-servingly brushes aside the COE's findings as "pretextual," those findings are supported by more than substantial evidence. *See Pro. Message*, 781 F.3d at 174 (substantial evidence is anything "more than a mere scintilla").

That substantial evidence, among other things, discloses any plausible inference that the COE's decisions were arbitrary and unreasonable or an abuse of discretion. *See Cooley*, 459 F.3d at 712. Far from any abridgement of due process, the COE expressly provided LMU-TN and LMU-FL time to cure the deficiencies identified prior to any adverse accreditation decision. *Compare* Compl. ¶ 198 (LMU-TN has two years to cure deficiencies), *with Pro. Massage*, 781 F.3d at 172-73 (no arbitrary or capricious decision when accrediting body provided plaintiff opportunities to satisfy accreditation metrics for "almost two years"). Moreover, although LMU decries the COE's evaluation of Standard 10 (Research Programs), LMU deliberately overlooks the fact that Standard 10 was not the only Standard in which LMU was deemed deficient. The COE also found that LMU-TN had a minor deficiency in Standard 7 (Admissions), and that LMU-FL's current and planned programs, if implemented, would not feasibly comply with *four* other Standards. Exs. C, D. Thus, even if the COE has abused its discretion in evaluating the application of Standard 10, LMU has not alleged, plausibly or otherwise, how all of the other myriad deficiencies identified were arbitrary and unreasonable.

This Court, affording "great deference" to the decisions of the COE, must reject LMU's invitation to "substitute [its] judgment for that of the [COE]." *Cooley*, 459 F.3d at 713. LMU has not exhausted the requisite administrative remedies, identified any deprivation of a protected property interest, or plausibly alleged an arbitrary and unreasonable decision by the COE lacking

substantial evidence. LMU's due process claim, in addition to its antitrust claims, therefore fails to rise above the speculative level sufficient to permit any injunctive relief.

## V. CONCLUSION

LMU's claims are not ripe. Its claims of violation of the antitrust laws and of due process fail to state any cognizable cause of action. LMU's proposed remedies of striking down the COE's research standard and divesting COE from the AVMA are within the exclusive province of the USDE. This Court cannot provide LMU the sweeping injunctive relief sought, and LMU's true grievance lies with the USDE and state legislatures. Plaintiff has failed to state any cognizable claim for the relief requested, and thus dismissal of the Complaint, in its entirety and with prejudice, is warranted.

Respectfully submitted this 3rd day of September, 2025.

**FREEMAN MATHIS & GARY, LLP**

*/s/ J. Cole Dowsley, Jr.*
J. Cole Dowsley, Jr. (TN BPR No. 024400)
1600 Division Street, Suite 590
Nashville, Tennessee 37203
(T): 615-208-5610
cole.dowsley@fmglaw.com

Cameron N. Regnery (admitted *pro hac vice*)
100 Galleria Parkway, Suite 1600
Atlanta, Georgia 30339
(T): 770-818-0000
cameron.regnery@fmglaw.com

*Attorneys for Defendant American Veterinary Medical Association*

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2025, a true and correct copy of the foregoing was filed via the Court's CM/ECF electronic filing system, which will deliver a Notice of Electronic Filing to the following:

James Conrad Lester
Maynard Nexsen, PC
1901 6th Ave N
Suite 1700
Birmingham, AL 35203
jlester@maynardnexsen.com

Timothy B McConnell
Maynard Nexsen PC
4800 Old Kingston Pike
Suite 120
Knoxville, TN 37919
tmcconnell@maynardnexsen.com

S. Reeves Jordan
Maynard Nexsen PC
1901 6th Ave N
Suite 1700
Birmingham, AL 35203
rejordan@maynardnexsen.com

Thomas W. Thagard, III
Maynard Nexsen PC
1901 6th Ave N
Suite 1700
Birmingham, AL 35203
tthagard@maynardnexsen.com

William B Grimes
Maynard Nexson PC
1901 6th Ave N
Suite 1700
Birmingham, AL 35203
bgrimes@maynardnexsen.com

Leah W. McClanahan
Long, Ragsdale & Waters, PC
1111 N. Northshore Drive, Suite 711
Knoxville, Tennessee 37919
lmcclanahan@lrwlaw.com

*/s/ J. Cole Dowsley, Jr.*
J. Cole Dowsley, Jr.