UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| LINCOLN MEMORIAL UNIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN VETERINARY MEDICAL ASSOCIATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.: 3:25-CV-282-TAV-CRW |

**MEMORANDUM OPINION**

This civil matter is before the Court on defendant's motion to dismiss [Doc. 27]. Plaintiff has responded in opposition [Doc. 34], defendant has replied [Doc. 39], and plaintiff has filed a sur-reply [Doc. 53]. This matter is now ripe for the Court's review. E.D. Tenn. L.R. 7.1(a). For the reasons explained below, the Court will **GRANT** the motion to dismiss [Doc. 27] and this case will be **DISMISSED without prejudice**. Defendant's motion to stay discovery [Doc. 29] and motion for a hearing [Doc. 38] are accordingly **DENIED as moot**.

## I. Background

The complaint alleges that the American Veterinary Medical Association ("AVMA") has conspired to exclude Lincoln Memorial University ("LMU") from the veterinary education market, for the purpose of restraining trade, eliminating competition, reducing output, and raising prices in both the domestic market for veterinary education and the domestic market for veterinary care and services, in violation of federal antitrust laws [Doc. 1 ¶ 2]. Specifically, plaintiff alleges that the AVMA's members have engaged in a

conspiracy to (a) reduce competition for students among the existing veterinary schools, and (b) reduce output of new veterinarians into the veterinary services market, thus increasing prices above normal competitive levels [*Id.* ¶ 4]. In particular, plaintiff contends that the AVMA is using its internal arm, the Council on Education ("AVMA COE") to restrict the accreditation of new and existing veterinary schools by demanding that they meet arbitrary, unreasonable and "impossible-to-meet" requirements that are not related to the minimum quality of education necessary to graduate day-one-ready veterinarians with entry-level competency, specifically, by requiring schools to offer students access to an unstated number and amount of research faculty, research curricula, research facilities, extramural grants, and exposure to graduate students involved in research [*Id.* ¶ 5]. Plaintiff additionally alleges that defendant is unlawfully utilizing its monopoly power in the United States market for accreditation of veterinary schools to restrict output in the veterinary education and services markets [*Id.* ¶ 23]. Further, plaintiff alleges that defendant's "arbitrary and unreasonable implementation of its accreditation standards" has resulted in the denial of due process to LMU [*Id.* ¶ 24].

The AVMA is a trade association representing over 100,000 veterinarians [*Id.* ¶¶ 4, 33, 44]. The AVMA exists to serve the interests, economic and otherwise, of its members, who are existing veterinary practitioners and academics [*Id.* ¶ 60]. The AVMA COE is recognized by the United States Secretary of Education as an agency responsible for the accreditation of Colleges of Veterinary Medicine ("CVM") which confer Doctor of Veterinary Medicine ("DVM") degrees [*Id.* ¶ 35]. Thus, through the AVMA COE, the AVMA maintains exclusive control over the accreditation of veterinary schools throughout

the United States [*Id.* ¶¶ 4, 35, 45]. As a result, the AVMA COE controls the flow of new CVM programs into the veterinary education market [*Id.* ¶ 57]. Similarly, the AVMA COE controls the class sizes that accredited schools are allowed to maintain, and nay increase in class size beyond a certain threshold must be approved by the AVMA COE, after a "substantive change request" by the institution [*Id.* ¶ 164]. However, the delegated accreditation authority from the Department of Education does not empower the AVMA COE to control or restrain the overall number of accredited institutions or the overall number of students who graduate from accredited institutions for any reason beyond the competency of student preparation and training [*Id.* ¶ 50].

Presently, there are only 34 accredited or provisionally accredited DVM programs in the United States [*Id.* ¶ 47]. All 50 states require a DVM to have graduated from an accredited school to practice veterinary medicine [*Id.* ¶ 54]. Additionally, if a veterinary school is not accredited, its students cannot obtain federal funding for student loans [*Id.* ¶ 55]. A school that operates an unaccredited CVM loses its eligibility for accreditation in the future [*Id.* ¶ 56].

The AVMA COE has established 11 standards veterinary schools must meet to receive initial accreditation and to maintain accreditation every 7 years, including: (1) organization; (2) finances; (3) physical facilities and equipment; (4) clinical resources; (5) information resources; (6) students; (7) admission; (8) faculty; (9) curriculum; (10) research programs; and (11) outcomes assessment [*Id.* ¶¶ 154–55]. Of relevance, Standard 10 (Research Programs) provides as follows:

> The college must foster and support an environment and culture of scientific inquiry. The college must maintain substantial research activities of high quality that integrate with and strengthen the professional program, such as basic science, clinical science, or scholarship in teaching and learning. Continuing scholarly productivity within the college must be demonstrated and the college must provide access to opportunities for any interested students in the professional veterinary program to be exposed to or participate in on-going high-quality research. All students must receive training in the principles, application, and ethics of research methods and in the appraisal and integration of research into veterinary medicine and animal health.

[*Id.* ¶ 156].

The AVMA COE's accreditation process proceeds as follows: (1) receipt of a written request for accreditation by a proposed CVM; (2) the AVMA COE's review of the request followed by its agreement to further consider the college for accreditation; (3) receipt and review of appropriate reports submitted by the college; (4) an consultative site visit to determine readiness for full consideration for accreditation; (5) a report to the college identifying any deficiencies in meeting the accreditation standards; (6) correction of any identified deficiencies and request for full consideration; (7) a comprehensive site visit to the college; (8) preparation of a report of evaluation by the AVMA COE's site visit team; (9) review of the report of evaluation by the full AVMA COE; and (10) assignment by the full Council of a classification of accreditation [*Id.* ¶ 159]. The "classifications of accreditation" include the following:

- ***Letter of Reasonable Assurance*** – This is a status awarded to developing colleges in the US and Canada. This recognition allows the College to pursue its plan for the veterinary program, and to admit students. Reasonable Assurance is not a pre-accreditation action, by the Council, and does not confer accreditation of any kind on a developing college.

- ***Provisional Accreditation*** – This is a status awarded a developing college in the US and Canada that has been granted Reasonable Assurance after the College has admitted its first class.

- ***Accredited*** – This is an accreditation status that is granted to a college that has no deficiencies in any of the Standards. This is awarded for a maximum of 7 years, with interim reporting required.

- ***Accredited with Minor Deficiency(ies)*** – This is an accredited status for a College that has one or more minor deficiencies in one or more of the Standards of Accreditation, and/or that has not materially complied with the Council procedures and/or directives. Minor deficiencies have minimal or no effect on student learning and safety and are readily corrected in one year. The deficiency or deficiencies must be resolved within one year to avoid a change in accreditation status.

- ***Probationary Accreditation*** – This is an accredited status for a College that has one or more major deficiencies in one or more Standards, and/or that has not materially complied with the Council procedures and/or directives. Major deficiencies have more than minimal impact on student learning and safety. The deficiency or deficiencies must be resolved within two years.

- ***Terminal Accreditation*** – This is an accredited status for a College that has not resolved deficiencies within the time allotted, and/or that has not materially complied with the Council procedures and/or directives. Terminal accreditation also can be assigned if the COE feels it is warranted based on information received.

[*Id.* ¶ 160]. An appeal may only be taken from an "adverse accreditation decision" by the AVMA COE, defined as "withholding initial or renewed accreditation, administrative withdrawal of accreditation, denial of a reasonable assurance status, or assignment of terminal accreditation" [*Id.* ¶ 162]. Probationary accreditation is not considered an "adverse accreditation decision" and there is no opportunity appeal the decision to place a school on probationary accreditation status [*Id.*].

Plaintiff alleges that the AVMA COE has recently begun to interpret its policies and procedures as demanding that every veterinary school "look like" the "elite, high-cost, high research activity institutions with on-site training hospitals" [*Id.* ¶ 165, 196]. Plaintiff states that this "abrupt shift in approach" coincides with the AVMA's expression of public concern about an anticipated "downward" affect of new veterinary schools on the prices veterinarians can command in the veterinary services market [*Id.* ¶¶ 9, 165]. According to plaintiff, the AVMA COE has shifted from focusing on how students are exposed to research as a component of career development to insisting on faculty research as a stand-alone activity [*Id.* ¶ 166].

The Richard A. Gillespie College of Veterinary Medicine at Lincoln Memorial University ("LMU-TN") offers a DVM program based in Harrogate, Tennessee [*Id.* ¶ 115]. LMU-TN is an independent, non-profit institution that receives no state subsidies [*Id.* ¶ 116]. Rather, its revenues are collected from application fees, tuition fees, technology fees, gifts, grants, research monies, student activity fees, and scholarship fees [*Id.*]. LMU-TN is currently the largest provider of veterinary education in the United States, with class sizes of 225 students per class and a student body that currently represents 4% of all students across the 34 domestic veterinary schools [*Id.* ¶¶ 13, 117].

LMU utilizes the "distributive" model for veterinary clinical education, which emphasizes hands-on clinical experience, requiring student to spend significant amounts of time working with licensed veterinarians at off-campus sites [*Id.* ¶ 127]. Unlike traditional high research activity institutions with teaching hospitals, where clinical rotations are completed on campus, the distributive model develops an expansive, nationwide network

of clinical affiliates with a variety of species and specialties, to which the school sends it students for exposure and learning [*Id.* ¶ 131]. The distributive model of education commonly allocates fewer tuition resources to expensive "bench" or lab research initiatives that are found at traditional high research activity institutions with teaching hospitals [*Id.* ¶ 137].

LMU-TN's campus was allowed to open for students in 2014 and received provisional accreditation [*Id.* ¶¶ 120, 167]. The AVMA COE conducted a comprehensive multi-day and multi-location site visit in 2018 as required and then, in 2019, granted LMU-TN full accreditation, finding the program in compliance with the research standard [*Id.*]. Annual reports by LMU-TN to the AVMA COE from 2019 to 2023 confirm LMU-TN's continued compliance with the research standard [*Id.*]. In July 2019, LMU-TN submitted a "substantive change request" to the AVMA COE requesting authorization to add an additional 100 seats to its existing class sizes of 125 [*Id.* ¶ 168]. The AVMA COE asked LMU-TN to provide "outcomes" data for its upcoming graduate classes first [*Id.*]. In May 2022, after graduating several class years, LMU-TN provided the AVMA COE with an exhausted set of outcomes data for its graduates [*Id.* ¶ 169]. In that submission, LMU-TN did not indicate that it had increased, or had any plans to increase, access to additional extramural grants for its research program or that it intended to hire any additional faculty dedicated to research or increase the quantity of faculty's research output [*Id.* ¶ 170]. Nonetheless, the AVMA COE approved LMU-TN's substantive change request at its September 2022 meeting and informed LMU-TN of that approval in October 2022 [*Id.* ¶¶ 9, 120, 171]. The letter notifying LMU-TN of the approval did not express any concerns about

the quality or quantity of LMU-TN's research offerings [*Id.*]. LMU-TN subsequently added an additional 100 students to its class sizes beginning with the January 2023 matriculating class [*Id.* ¶ 172].

Thereafter, the AVMA began to "openly acknowledge[] its desire to restrict output in both the veterinary education and services markets in order to ensure the artificial stabilization of prices that can be charged to consumers of veterinary services" [*Id.* ¶¶ 15, 105; *see also id.* ¶¶ 17, 110 (Oct. 2024 blog post), ¶¶ 18, 111 (Nov. 2024 article), ¶¶ 16, 109 (Jan. 2025 statement of AVMA President)].

Plaintiff alleges that in 2024, at the same time the AVMA begin to "decry a future glut of veterinarians and the threat of 'downward economic pressure' on the market, the AVMA COE moved the goalpost on LMU-TN" [*Id.* ¶¶ 165, 184]. The AVMA COE conducted a "focused" site visit to LMU-TN's campus in February 2024, purportedly to review LMU-TN's continued compliance with the accreditation standards in light of the increase to class sizes [*Id.* ¶ 185]. Plaintiff states that the "stated purpose of this 'focused' visit was not to reassess LMU-TN's research program," but the AVMA COE nonetheless utilized this site visit as the vehicle for generating a new set of purported major "deficiencies" in LMU-TN's research program [*Id.* ¶¶ 185–86 (emphasis omitted)]. On October 24, 2024, the AVMA COE placed LMU-TN on probation accreditation status for a claimed "major deficiency in Standard 10 – Research" [*Id.* ¶ 186]. Plaintiff contends that this determination "represented a dramatic change in course by the AVMA COE with respect to its evaluation of LMU-TN, which had maintained full accredited status with the AVMA COE since 2019 without incident" [*Id.* ¶¶ 8, 186]. Specifically, plaintiff alleges

that the sudden allegations of a "research deficiency" are "arbitrary" and "a complete about-face from the AVMA COE's previous stance with respect to LMU-TN" [*Id.* ¶ 187]. Plaintiff states that these alleged "failures" relate solely to limited faculty research productivity and the lack of extramural grant funding, which are emphases that are absent from the AVMA COE's research standard as written [*Id.*; *see also* ¶¶ 188, 190]. The decision to place LMU-TN on probationary accreditation status is a necessary intermediate step and precursor to the termination of LMU-TN's accreditation altogether if the purported deficiencies are not resolved within two years, in LMU-TN's case, by October 2026 [*Id.* ¶¶ 8, 198]. Plaintiff alleges that the "deficiencies" in the research standard set forth by the AVMA COE as grounds for placing LMU-TN on probationary accreditation are pretextual findings to justify the eventual de-accreditation of LMU-TN to further the conspiracy to increase prices for veterinary services on behalf of the AVMA's members [*Id.* ¶ 195]. Plaintiff alleges that the decision to place LMU-TN on probationary accreditation has eliminated its ability to expand class sizes in the short term, and also "places a cloud over LMU that affects employers, faculty, staff, and students" [*Id.* ¶¶ 25, 29, 197]. Plaintiff alleges ongoing and threatened future injuries relating to the placement of LMU-TN on probationary accreditation including negative reputational effects, lost revenues, diminished ability to recruit faculty, and exclusion from the veterinary education market altogether [*Id.* ¶ 29, 197]. Plaintiff states that the "likely effect [is] that the AVMA COE will terminate LMU-TN's accredited status altogether at the earliest opportunity" [*Id.* ¶ 199].

In 2023, LMU announced plans to open its second distributive model CVM campus in Orange Park, Florida ("LMU-FL") [*Id.* ¶¶ 125, 203]. LMU plans to enroll students at

LMU-FL beginning in 2026, with initial class sizes of 150 students per year [*Id.*].[1] The AVMA COE conducted a "consultative" site visit in November 2023 and a "comprehensive' site visit in January 2025 [*Id.* ¶ 204]. Plaintiff notes that the timing of the comprehensive site visit "closely aligns with the AVMA's ramp-up in 2024 and 2025 of its public campaign" to express concern about "downward economic pressure" new veterinary schools would inflict on the veterinary services market [*Id.*]. Subsequent to the comprehensive site visit, the AVMA COE provided LMU-FL with a "Report of Evaluation for a Comprehensive Visit for a Letter of Reasonable Assurance" ("ROE") [*Id.* ¶ 206]. The ROE stated that LMU-FL had serious deficiencies in three main areas: (1) research activity; (2) the opportunity for "direct experiences" with interns and residents; and (3) a need to add additional faculty members [*Id.* ¶ 207]. As to the research standard, plaintiff alleges the AVMA COE is not following its own requirements set forth in that standard, because, rather than focusing on the requirement that research relate to and inform student experience and learning, the AVMA COE is imposing a requirement that stand-alone research be maintained and funded by the college at levels the AVMA COE cannot articulate [*Id.* ¶¶ 208–10]. Plaintiff contends that the deficiency findings as to LMU-FL are a precursor to the impending denial of LMU-FL's application for accreditation [*Id.* ¶ 12]. Plaintiff

[1] The Court takes judicial notice that LMU-FL appears to have proceeded with its plans to accept students in 2026, with its inaugural class begun class in or about June 2026. *See* LMU-College of Veterinary Medicine at Orange Park, FACEBOOK (June 5, 2026), https://www.facebook.com/share/p/1ETgNtkwZb/ ("Orientation day for the FIRST LMU-OPCVM class is in the books!"); *see also* LMU-OPCVM Orientation Class of 2029, FLICKR, https://www.flickr.com/photos/lincolnmemorialuniversity/albums/72177720334025547/ (last visited Aug. 31, 2026) [https://perma.cc/CF86-M8UA].

alleges that the threatened denial of accreditation to LMU-FL will have devastating effects on that CVM, as it would result in the total exclusion of LMU-FL from the veterinary education market [*Id.* ¶ 222]. The threatened exclusion of LMU-FL from the veterinary education market also harms competition, as the denial of accreditation would result in a significant restriction in output in the veterinary education market and its already dissuading other potential market entrants [*Id.* ¶ 223].

Plaintiff brings claims under the Sherman Act, 15 U.S.C. §§ 1, 2, for restraint of trade in the veterinary services market (Count 1), restraint of trade in the veterinary education market (Count 2), unlawful use of monopoly power (Count 3), as well as a claim for violation of due process under federal common law (Count 4) [Doc. 1, pp. 55–66]. As relief, plaintiff seeks an order "[e]njoining the AVMA from applying the AVMA COE's accreditation standards . . . in a manner more restrictive than necessary for new and existing veterinary medical education programs to graduate students with entry-level competency to be practicing veterinarians," "requiring a total and complete separation of the AVMA COE's powers of accreditation from the AVMA and the creation of a separate, unbiased entity that is not operated by a trade association with inherently inconsistent economic incentives," and "[e]njoining the AVMA from applying the AVMA COE's accreditation standards in an arbitrary, capricious, and inconsistent manner" [*Id.* at 66].

## II. Standard of Review

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure a court may, at any time, *sua sponte* or upon the motion of a party, dismiss a complaint for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "A court lacks jurisdiction over the subject matter if

the claim is not yet ripe for judicial review." *Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002); *see also Bigelow v. Michigan Dep't of Nat. Res.*, 970 F.2d 154, 157 (6th Cir. 1992) ("If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed."). A plaintiff bears the burden of proving subject matter jurisdiction in order to survive dismissal pursuant to Rule 12(b)(1). *Cartwright v. Garner*, 751 F.3d 752, 760 (6th Cir. 2014). In considering a Rule 12(b)(1) motion, "a district court may consider factual matters outside the pleadings and resolve factual disputes." *Anestis v. United States*, 749 F.3d 520, 524 (6th Cir. 2014). But while "a court may consider affidavits and other documents outside the record on a Rule 12(b)(1) motion, but it must do so in a manner that is fair to the non-moving party." *Tebault v. United States*, 778 F. Supp. 3d 912, 917 (W.D. Ky. 2025) (alteration omitted).

## III. Analysis

Defendant argues that plaintiff's claims are not ripe because they are dependent on a contingent future event, namely, a final decision denying accreditation after plaintiff has exhausted its ability to appeal [Doc. 27-1, pp. 14–15]. Defendant states that LMU-TN remains accredited and LMU-FL remains eligible for a Letter of Reasonable Assurance[2] [*Id.* at 15]. A final decision denying accreditation would only occur if LMU-TN or LMU-FL do not cure the identified deficiencies in the time provided, suffer an adverse accreditation decision, and are unsuccessful on appeal [*Id.*]. Defendant contends that it is too speculative at this point whether there will ever be a "problem" that needs "solving"

[2] As noted *infra*, the record reflects that LMU-FL has, since the filing of defendant's brief in support of its motion to dismiss, received a Letter of Reasonable Assurance.

[*Id.*]. Defendant contends that plaintiff will not suffer any substantial hardship warranting premature judicial review of its speculative harms [*Id.* at 16]. And even if plaintiff suffers an adverse accreditation decision, it has the recourse of an appeal before a final decision on accreditation [*Id.* at 16–17]. To the extent that plaintiff complains of the general possibility of losing accreditation, this is not a unique or specialized hardship, as every program in the United States is always under the possibility that it will one day be denied accreditation [*Id.* at 17].

Plaintiff responds that it has alleged both current and threatened injuries [Doc. 34, p. 7]. As to current injuries, plaintiff contends that the decision to place LMU-TN on probationary accreditation status is injuring plaintiff right now, including through (i) an inability to further expand class sizes; (ii) negative reputational effects; (iii) lost revenues; (iv) decreased ability to obtain grants, donations, and other sources of funding; and (v) decreased ability to recruit faculty and staff [*Id.* at 8]. Plaintiff states that the threatened future injury is the termination of its accreditation status at the end of the probationary period in October 2026, which will result in its exclusion altogether from the veterinary education market [*Id.* at 9]. Plaintiff contends that this is not a mere possible future injury, as it alleged in the complaint that it is "virtually impossible" for LMU-TN to comply with the AVMA's application of its research standard [*Id.*]. Because it cannot cure the alleged research deficiency, plaintiff asserts this is not a case of avoidable injury or self-inflicted harm [*Id.*]. As to LMU-FL, at the time of filing the complaint, the threatened future injury was similar—the inability to operate a new veterinary school due to the AVMA's findings [*Id.*]. Plaintiff acknowledges that the AVMA subsequently granted LMU-FL a Letter of

Reasonable Assurance in August 2025, but argues that this post-filing action does not impact standing, which is determined at the time the complaint is filed [*Id.* at 10].

Defendant replies that LMU-FL's receipt of the Letter of Reasonable Assurance simply confirms that the threatened injury was always contingent on future events that may or may not occur as anticipated or at all [Doc. 39, p. 9]. Next, defendant contends that plaintiff's argument that LMU-TN is threatened with termination of its accreditation status at the end of its probationary period in October 2026, is a similarly speculative and hypothetical threatened injury [*Id.*]. If LMU-TN cures the identified deficiencies within the allotted two-year period (which may be extended), it will presumably avoid any adverse accreditation decision [*Id.*]. Although plaintiff argues that it is "virtually impossible" for it to cure the deficiencies, this is contradicted by its own allegations [*Id.* at 9–10]. Specifically, defendant argues that (a) Western University of Health Sciences has utilized the distributive model for over 20 years and is currently accredited with no deficiencies, and (b) LMU-FL also uses the distributive model and received a Letter of Reasonable Assurance acknowledging that their planned program was likely to comply with the standards [*Id.* at 10]. Defendant contends that these allegations confirm that it is not "virtually impossible" for a distributive model veterinary school to satisfy the AVMA COE's standards [*Id.*]. Third, defendant contends that plaintiff alleges LMU-TN is threatened with ongoing harm as a result of its probationary status, but does not clearly allege facts demonstrating such supposed ongoing harm [*Id.*]. Plaintiff complains of "reputational effects," "lost revenues," and "decreased ability" to recruit and obtain funding, but does not proffer factual allegations detailing any concrete economic or reputational harms [*Id.*]. Defendant states that, to the

extent that plaintiff relies on its inability to increase class size, that fact is not due to LMU-TN's placement on probationary status [*Id.*].

In its sur-reply, plaintiff argues that the AVMA cannot dispute that once a school is on probation, it faces a substantial risk of termination [Doc. 41-1, p. 5]. Additionally, plaintiff argues that once the program is terminated it will be too late, hence why this suit is necessary at this juncture [*Id.*].

"The Constitution does not extend the 'judicial Power' to any legal question, wherever and however presented, but only to those legal questions presented in 'Cases' and 'Controversies.'" *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (citing U.S. CONST. art. III, § 2). "A claim is not amenable to the judicial process when it is filed too early (making it unripe), when it is filed too late (making it moot) or when the claimant lacks a sufficiently concrete and redressable interest in the dispute (depriving the plaintiff of standing)." *Id.* (internal quotations marks, alterations, and citation omitted).

As an initial matter, the Court notes that the parties' briefs often lump arguments related to "ripeness" and arguments related to "standing" together. The doctrines of ripeness and standing "unquestionably overlap[.]" *Id.* (internal alterations omitted) (quoting *Airline Pros. Ass'n of the Int'l Bhd. of Teamsters v. Airborne, Inc.*, 332 F.3d 983, 988 (6th Cir. 2003)). "When the injury alleged is not actual but merely threatened, standing and ripeness become more difficult to distinguish." *Airline Pros.*, 332 F.3d at 988. Nonetheless, ripeness and standing remain separate concepts. And "[a] threatened or imminent injury may satisfy standing's injury-in-fact requirement, yet the claim may still be unripe if the issues are not

fit for judicial review, perhaps because future events may greatly affect the outcome of the litigation and the cost of waiting is not particularly severe." *Id.*

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements.'" *Kentucky Press Ass'n, Inc. v. Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)). "'Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *Id.* (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 294 (6th Cir. 1997)); *see also Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all" (internal quotation marks omitted)).

"The ripeness doctrine reflects a judgment that the disadvantages of a premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of—even repetitive—postimplementation litigation." *Ohio Foresty Ass'n Inc v. Sierra Club*, 523 U.S. 726, 735 (1998). Three factors are relevant to the ripeness analysis: (1) "the likelihood that the harm alleged by the plaintiffs will ever come to pass"; (2) "whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims"; and (3) "the hardship to the parties if judicial relief is denied at this stage in the proceedings." *Kentucky Press Ass'n, Inc.*, 454 F.3d at 509 (quoting *Adult Video Ass'n v. United States Dep't of Just.*, 71 F.3d 563, 568 (6th Cir. 1995)). Given the overlap between the first two factors, other courts have condensed the ripeness analysis to two inquiries. "The ripeness analysis consists of two parts. First, courts ask whether the

claim is fit for judicial decision, or, in other words, whether it arises in a concrete factual context and concerns a dispute that is likely to come to pass. Second, courts ask whether withholding court consideration would cause hardship to the parties." *Holman v. Vilsack*, 582 F. Supp. 3d 568, 580–81 (W.D. Tenn. 2022) (internal quotation marks, alterations, and citations omitted). "To be ripe for review, claims must satisfy both the fitness and the hardship components of the inquiry." *Airline Pros.*, 332 F.3d at 988.

**A. Fitness for Judicial Decision**

**1. Threatened Harms**

Plaintiff alleges that LMU-TN faces the threatened harm of termination of its accredited status at the end of the probationary period in October 2026 [Doc. 34, p. 9]. Plaintiff also alleges that, at the time of the filing of the complaint, LMU-FL had a similar threatened injury, that is, the denial of accredited status [*Id.*]. But this threatened harm is simply too speculative at this juncture.

As to LMU-FL, despite plaintiff's allegation that the program would likely be denied accreditation [Doc. 1 ¶¶ 27, 222], the record reflects that, since the filing of the complaint, the AVMA COE has granted LMU-FL a Letter of Reasonable Assurance [Doc. 31, p. 11; Doc. 34, p. 10; Doc. 53, p. 5]. And, indeed, the AVMA's website now lists LMU-FL as a "provisionally accredited college[]." Accredited veterinary colleges, AVMA, https://www.avma.org/education/center-for-veterinary-accreditation/accredited-veterinary-colleges (last viewed Aug. 27, 2026) [https://perma.cc/G9PY-A8Y2]; *see also* Accreditation, About OPCVM, LMU College of Veterinary Medicine Orange Park, Florida, https://www.lmunet.edu/orange-park-college-of-veterinary-medicine/about-

opcvm/accreditation (last viewed Aug. 28, 2026) [https://perma.cc/D9RG-LDCF] ("Lincoln Memorial University-Orange Park College of Veterinary Medicine (LMU-OPCVM) is proud to announce that the program has been granted **Provisional Accreditation** by the American Veterinary Medical Association Council on Education (AVMA COE)" (emphasis in original)). Plaintiff attempts to frame this factual development as "voluntary compliance" and any arguments relating to the Letter of Reasonable Assurance as related to "mootness" [Doc. 34, p. 10; Doc. 53, p. 5]. But the Court finds that these arguments miss the mark. Rather than being indicative that the AVMA COE has changed course or that plaintiff's claims relating to LMU-FL are moot in light of this development, the fact that LMU-FL has now been granted provisional accreditation is a prime example of why the types of threatened injuries plaintiff relies upon are too speculative at this juncture. Plaintiff's purported threatened injury as to LMU-FL was that a Letter of Reasonable Assurance and provisional accreditation would be denied, and LMU-FL would be excluded from the veterinary education market [Doc. 1 ¶ 27]. That, however, did not occur. In other words, the case, as it relates to LMU-FL, is "anchored in future events that may not occur as anticipated, or at all," *see Kentucky Press Ass'n*, 454 F.3d at 509, and, indeed, during the pendency of this motion to dismiss, the future events relating to LMU-FL, that is, the denial of a Letter of Reasonable Assurance and/or provisional accreditation, did not occur at all.

Similarly, plaintiff's purported threatened injury as to LMU-TN is that, at the end of the probationary period, LMU-TN will be placed on terminal accreditation status and, ultimately, excluded from the veterinary education market [Doc. 1 ¶¶ 198–99]. But just as

with plaintiff's speculation as to the AVMA COE's future actions as to LMU-FL's accreditation status, its speculation as to the future actions regarding LMU-TN's accreditation status may never come true. The AVMA COE's Accreditation Policies and Procedures, which plaintiff cites extensively throughout the complaint [*see* Doc. 1], state that a CVM placed on probationary accreditation has two years to correct the identified deficiencies. 3.2.6 Probationary accreditation, COE ACCREDITATION POLICIES AND PROCEDURES, https://www.avma.org/education/center-for-veterinary-accreditation /accreditation-policies-and-procedures-avma-council-education-coe/coe-accreditation-policies-and-procedures-classifications (last visited Aug. 31, 2026) [https://perma.cc/R3LS-EZ8X]. If deficiencies are corrected, the CVM may be returned to accredited status. *Id.* On the other hand, a CVM "that fails to correct major deficiencies within two years, will be placed on Terminal Accreditation unless an Extension for Good Cause for up to one year is granted, or pending an appeal." *Id.* A good cause extension of the two-year deadline may be granted "if the college has implemented a remediation plan and can demonstrate that enough progress has been made to complete the plan within one year" or "if the college can demonstrate that the reasons for the non-compliance are beyond the college's control and the college projects that the resources necessary to address the non-compliance issues will be operative within the time allotted." *Id.* Thus, a number of future events could occur with regard to LMU-TN's probationary accreditation status: (1) LMU-TN could be returned to full accreditation status; (2) LMU-TN could receive a good cause extension to cure the identified deficiencies, based on a number of potential grounds, as set forth in the AVMA COE's polices and procedures; or (3) LMU-TN could

be placed on terminal accreditation. Because the Court does not have a crystal ball to determine the future course of events as to LMU-TN's accreditation status, and, under some of these potential outcomes, LMU-TN's threatened injury would not come to pass, the Court finds that the threatened injury to LMU-TN is not sufficient to support a finding of ripeness. *See Staver v. Am. Bar Ass'n*, 169 F. Supp. 2d 1372, 1377 (M.D. Fla. 2001) (finding that a claim that the American Bar Association improperly applied its Standards by denying a school provisional accreditation was not ripe because the American Bar Association had not yet reached a final decision as to the school's application).

Even assuming LMU-TN is placed on terminal accreditation in October 2026, however, that is not the final accreditation determination. The AVMA COE's accreditation policies and procedures reflect that a CVM "with Terminal Accreditation status may request reevaluation" and such will be considered "if the college can provide evidence that the deficiency(ies) resulting in the Terminal Accreditation status has(have) been resolved." 3.2.8 Reevaluation, COE ACCREDITATION POLICIES AND PROCEDURES, https://www.avma.org/education/center-for-veterinary-accreditation/accreditation-policies-and-procedures-avma-council-education-coe/coe-accreditation-policies-and-procedures-classifications (last visited Aug. 31, 2026) [https://perma.cc/R3LS-EZ8X]. Additionally, the assignment of terminal accreditation is deemed an "adverse accreditation decision," which a CVM may appeal. 2.5.4 Appeals procedures for adverse outcomes, COE ACCREDITATION POLICIES AND PROCEDURES, https://www.avma.org/education/center-for-veterinary-accreditation/accreditation-policies-and-procedures-avma-council-education-coe/coe-accreditation-policies-and-procedures-classifications (last visited Aug. 31, 2026)

[https://perma.cc/R3LS-EZ8X]. During an appeal, a hearing panel is appointed, comprised of seven persons, none of whom are current members of the AVMA COE or AVMA staff. *Id.* The hearing panel "may either affirm or amend an adverse decision, or remand the adverse decision to the Council for further consideration." *Id.* And, importantly "[t]he accreditation status of the petitioning college shall remain unchanged during the review [on appeal; there shall be no public notice of the adverse decision until the review is complete and a final decision rendered." *Id.* Accordingly, the Court would benefit from further development of the factual record before determining the legal issues raised.

**2. Current Harms**

LMU also alleges that LMU-TN is experiencing current harms as a result of its placement on probationary accreditation, including inability to further expand class sizes, negative reputational effects, lost revenues, decreased ability to obtain grants and/or funding, and decreased ability to recruit faculty and students [Doc. 34, p. 8].[3]

The Court first turns to the disputed allegation regarding LMU-TN's ability to expand class sizes. In its complaint, plaintiff alleges that the AVMA COE's decision to place LMU-TN on probationary accreditation has eliminated LMU-TN's ability to expand its class sizes in the short term beyond the current class size of 225 [Doc. 1 ¶ 25]. In its response to the motion to dismiss, plaintiff reiterated that "LMU-TN's probationary status already limits its ability to increase its class sizes" [Doc. 34, pp. 7, 13]. Defendant, on the other hand, states that the reason LMU-TN cannot increase its class sizes is not because of

[3] Plaintiff does not appear to allege that LMU-FL is experiencing any current injury [*See* Doc. 34, p. 8 (addressing only LMU-TN under the subheading "LMU's current injuries")].

its placement on probationary accreditation, but rather, because of the recent expansion of its class sizes, and the limitation on further expansions under the AVMA COE's Polices and Procedures [Doc. 39, pp. 6–7]. Plaintiff offers no rebuttal to this in its sur-reply brief [*See* Doc. 53].

The AVMA COE's Policies and Procedures indicate that the AVMA COE must be notified and grant approval prior to the implementation of any substantive changes in the program at an accredited college. 3.4.1 Reporting substantive change, COE ACCREDITATION POLICIES AND PROCEDURES, https://www.avma.org/education/center-for-veterinary-accreditation/accreditation-policies-and-procedures-avma-council-education-coe/coe-accreditation-policies-and-procedures-classifications (last visited Aug. 31, 2026) [https://perma.cc/R3LS-EZ8X]. Substantive changes include increases in the number of students or class sizes within certain parameters. *Id.* However, "[o]nce a substantive change has been approved, the Council will not consider another substantive change in student numbers . . . beyond the approved number until after one year graduation outcomes . . . for the largest class size approved are available for the program and the Council to review." *Id.* By plaintiff's own admission, LMU-TN was granted a substantive change request by the AVMA COE to increase its class size from 125 to 225 beginning with the January 2023 matriculating class [Doc. 1 ¶¶ 168, 172]. LMU-TN's DVM program is a four-year program. Doctor of Veterinary Medicine, Professional Program, RICHARD A. GILLESPIE COLLEGE OF VETERINARY MEDICINE LINCOLN MEMORIAL UNIVERSITY, https://www.lmunet.edu/college-of-veterinary-medicine/professional-program/ (last viewed Aug. 31, 2026), [https://perma.cc/4EFC-8XXK]. Accordingly, LMU-TN is not

eligible, under the AVMA COE's Policies and Procedures, to seek to further increase its class sizes until at least January 2028, one year after the January 2023 matriculating class graduates in January 2027. *See* 3.4.1 Reporting substantive change, COE ACCREDITATION POLICIES AND PROCEDURES, https://www.avma.org/education/center-for-veterinary-accreditation/accreditation-policies-and-procedures-avma-council-education-coe/coe-accreditation-policies-and-procedures-classifications (last visited Aug. 31, 2026) [https://perma.cc/R3LS-EZ8X]. Because LMU-TN's inability to increase its class size appears to be based on the AVMA COE's policies and procedures as relate to subsequent requests for class size increase, rather than based on LMU-TN's placement on probationary status, the Court does not find that this alleged harm is sufficient to deem this matter ripe for review.

Turning to plaintiff's allegations of negative reputational effects, lost revenues, decreased ability to obtain grants and/or funding, and decreased ability to recruit faculty and students [Doc. 34, p. 8], plaintiff simply has not met its burden of adequately pleading such alleged current harms, even if they could otherwise support a finding of ripeness. In the complaint, plaintiff simply alleges the following:

- "LMU's current probationary status for its existing CVM program in Tennessee places a cloud over LMU that affects employers, faculty, staff, and students. LMU's ongoing and threatened injuries include, among other things, negative reputational effects, lost revenues, diminished ability to recruit faculty, and ultimately the exclusion of LMU from the veterinary education market altogether" [Doc. 1 ¶ 29];

- "The AVMA's anticompetitive accrediting activities have, and will continue to have, a deleterious impact on LMU's ability to recruit and enroll out-of-state students, receive tuition revenues from out-of-state sources, and attract out-of-state faculty and staff members" [*Id.* ¶ 43];
- Placing LMU-TN on probation accreditation "has resulted and will continue to result in negative reputational effects on LMU-TN's program, placing a cloud over LMU-TN that affects employers, faculty, staff, and students. The harms to LMU-TN from its public placement on probation include lost revenues, decreased ability to recruit faculty, and increased difficulty in securing grants and donations and economic opportunities for the school and its faculty" [*Id.* ¶ 197].

But plaintiff makes no specific allegation that it has suffered a reduction in the number of admissions applications, faculty position applications, or funding sources. And, indeed, LMU-TN still purports to be "the largest college of veterinary medicine in the country." Doctor of Veterinary Medicine, LINCOLN MEMORIAL UNIVERSITY, https://www.lmunet.edu/academics/programs/graduate-professional/doctor-of-veterinary-medicine-at-harrogate, (last visited Aug. 31, 2026), [https://perma.cc/SN82-APX4]; *see also* Nikki Lockhart, *LMU-College of Veterinary Medicine at Orange Park to Begin Classes June 2026*, LINCOLN MEMORIAL UNIVERSITY, Aug. 29, 2025, https://www.lmunet.edu/news/2025/08/lmucvm_orangepark, [https://perma.cc/US37-H36Y] (stating that LMU-TN is "the nation's largest veterinary school by enrollment"). Moreover, to the extent that plaintiff alleges that its placement on probationary accreditation

status negatively impacts its ability to recruit out-of-state students and faculty, plaintiff does not explain, nor is it clear on its face, why out-of-state students and faculty would be more impacted by the probationary accreditation status than in-state students and faculty.

Finally, turning to reputational effects, to the extent that plaintiff seeks to allege harms to its students or faculty members, LMU-TN's students and/or faculty are not parties to this action, and therefore, any alleged harms to those individuals is not an appropriate consideration in determining whether this action is ripe for review. *See S. Cali. Institute of Law v. Biggers*, No. SACV 13-193, 2013 WL 11317728, at * (C.D. Cali. June 12, 2013) (noting that a school's students and faculty were not parties to the action, and therefore, any alleged effects on them were irrelevant to the ripeness inquiry). Moreover, for purposes of determining ripeness, a "showing of reputational harm must be concrete and corroborated, not merely speculative." *In re Facebook, Inc., IPO Securities and Derivative Litigation*, 922 F. Supp. 2d 445, 474 (S.D.N.Y. 2013) (quoting *Trudeau v. Fed. Trade Comm'n*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005)). Plaintiff, however, provides no examples of how its reputation has been harmed by its placement on probationary accreditation, relying, instead, on vague statements of reputational harm. This is insufficient for plaintiff to meet its burden of establishing that its claims are ripe for review.

For all of these reasons, the Court finds that plaintiff has not sufficiently shown that it is being currently harmed or that it is facing a threatened harm that is likely to occur. See Holman, 582 F. Supp. 3d at 580–81. Accordingly, plaintiff has not established that its claims are presently fit for judicial review, and, on this ground alone, the Court finds

plaintiff's claims are not ripe. *See Airline Pros.*, 332 F.3d at 988 (stating that, to be ripe, claims must satisfy both the fitness and hardship components of the ripeness inquiry).

### B. Hardship if Relief Denied At This Stage

Plaintiff appears to frame the hardship that it will face if the Court does not address the merits of its claims at this stage as its exclusion from the veterinary services market completely [*See* Doc. 53, p. 4 ("Once the program is terminated, it will be too late.").]. But that argument presupposes that the claims raised herein could not be ripe until the AVMA COE has made a final decision terminating a school's accreditation and the appeal has been exhausted. The Court's holding at this stage is not so broad. The Court declines to set the exact parameters, at the stage, of when plaintiff's claims may become ripe, based on potential future events. But the Court's concludes that those claims are not yet ripe, given that neither LMU-TN nor LMU-FL have experienced any adverse accreditation determinations, as defined by the AVMA COE, at this juncture.

Instead, the hardship plaintiff will face by not having its claims heard at this juncture are the general hardships that it will have to proceed through the normal channels under the AVMA COE's policies and procedures, both as to the next steps regarding LMU-TN's probationary accreditation status and the continuation of LMU-FL's provisionally accreditation. And, specifically as to LMU-TN, as the Court noted *supra*, even if LMU-TN is assigned terminal accreditation, a number of options exist under the AVMA COE's Policies and Procedures, including an appeal procedure, during the pendency of which, LMU-TN's accreditation and ability to matriculate students will remain unchanged. 2.5.4

Appeals procedures for adverse outcomes, COE ACCREDITATION POLICIES AND PROCEDURES, https://www.avma.org/education/center-for-veterinary-accreditation/accreditation-policies-and-procedures-avma-council-education-coe/coe-accreditation-policies-and-procedures-classifications (last visited Aug. 31, 2026) [https://perma.cc/R3LS-EZ8X]. Accordingly, the Court concludes that plaintiff has not established that it would suffer any particularly severe hardship if review is denied, at least at this stage.

## IV. Conclusion

"Answering difficult legal questions before they arise and before the courts know how they will arise is not the way we typically handle constitutional litigation." *Warshak*, 532 F.3d at 526. That is precisely what plaintiff asks the Court to do in this case. Accordingly, for the reasons above, the motion to dismiss [Doc. 27] is **GRANTED**, and this case will be **DISMISSED without prejudice** for lack of subject-matter jurisdiction. Defendant's motion to stay discovery [Doc. 29] and motion for a hearing [Doc. 38] are accordingly **DENIED as moot**. An appropriate order will enter.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE